**STATE of Missouri, Respondent,**

v.

**Dan Westley GRAY, Appellant.**

**Nos. 49313, 52502, 57076.**

Supreme Court of Missouri,
Division No. 1.

April 10, 1972.

John C. Danforth, Atty. Gen., Stephen D. Hoyne, Asst. Atty. Gen., Jefferson City, for respondent.

David E. Blanton, Sikeston, court appointed attorney for defendant-appellant.

HIGGINS, Commissioner.

Dan Westley Gray, charged with murder, first degree, was convicted of murder, second degree, by a jury which assessed his punishment at 60 years' imprisonment. Sentence and judgment were rendered accordingly. §§ 559.010, 559.020, 559.030, V. A.M.S. His appeal from such judgment and sentence, No. 49,313, is consolidated with his appeal from denial, after evidentiary hearing, of motion under Criminal Rule 27.26, V.A.M.R., to vacate and set aside the judgment and conviction, No. 52,502, and his appeal from denial, without evidentiary hearing, of a second such motion, No. 57,076.

On September 12, 1960, in New Madrid County, Dan Westley Gray shot and killed Cleatus Leo Phillips, a deputy sheriff of New Madrid County. On November 17, 1960, after preliminary hearing, the information charging him with murder, first degree, was filed. On June 13, 1961, the Honorable William L. Ragland, Judge of the Circuit Court of New Madrid County, was disqualified; and, on June 27, 1961, the Honorable Ray Weightman was transferred by the Supreme Court of Missouri to sit as special judge in the case. On July 11, 1961, defendant filed "Motion to Disqualify Sheriff, Deputies, and Appointees, and Coroner," on grounds of their close relation to the deceased, and prayed the appointment of an elisor to serve process and to summon jurors, representing that any member of the New Madrid County Bar, other than those involved in the case, would make a fair and impartial elisor. On July 19, 1961, the court appointed Harry H. Bock and Charles C. Hatley as special officers to perform all duties in the case of the sheriff and deputies,

and they secured the necessary jurors. On September 20, 1961, trial commenced and, on September 21, 1961, the jury returned its verdict. On October 19, 1961, defendant's Motion for New Trial was filed, reciting sixteen grounds for relief. On November 30, 1961, the Motion for New Trial was denied and sentence and judgment were rendered and, on December 1, 1961, Notice of Appeal was filed. Defendant was represented by counsel of his own choosing throughout all such proceedings.

The appeal was submitted on the State's brief and the motion for new trial; and, according to the practice then prevailing, appellant, unrepresented by counsel, received a review on the allegations of his motion for new trial. On October 8, 1962, the judgment of conviction was affirmed. State v. Gray, No. 49,313, Mo., 360 S.W.2d 642.

On April 26, 1965, Dan Westley Gray filed his first motion to vacate judgment and sentence under Rule 27.26, alleging violation of Sections 476.290 and 476.300, V. A.M.S., in that at the time of preliminary hearing, Hal E. Hunter, Jr., was Clerk of the Magistrate Court and Assistant Prosecuting Attorney of New Madrid County and, as such, executed the information upon which defendant was tried. On July 27, 1965 (Judge Weightman having retired), the Honorable Marshall Craig was assigned to the case. On November 26, 1965, the motion was amended to allege that an involuntary confession had been used in the course of his trial. Raymond A. Klemp was appointed to represent movant and, on July 2, 1966, an evidentiary hearing was accorded. On August 13, 1966, the court made findings and denied relief; and on August 29, 1966, notice of appeal was filed and the appeal was assigned No. 52,502.

On August 11, 1967, while appeal No. 52,502 was pending in this court, the United States District Court for the Western District of Missouri, in a habeas corpus proceeding, found that movant was entitled to the writ on the ground he had not had counsel on his original appeal, No. 49,313, but stayed execution of the writ upon condition that this court grant him a new appeal with counsel. Gray v. Swenson, D.C. W.D.Mo., 271 F.Supp. 912; Bosler v. Swenson, 8 Cir., 363 F.2d 154; Swenson v. Donnell, 8 Cir., 382 F.2d 248. On September 11, 1967, this court, on its own motion and consistent with the foregoing authorities, vacated the judgment of October 8, 1962, No. 49,313, affirming the conviction, State v. Gray, Mo., 360 S.W.2d 642, supra, recalled the mandate of October 24, 1962, consolidated the appeal with the then undecided appeal, No. 52,502, and ordered the Circuit Court of New Madrid County to appoint counsel for appellant with directions to counsel to file an appeal brief for appellant. Mr. Klemp served as appointed counsel on the consolidated appeal; and, on October 25, 1968, the judgment of conviction was again affirmed and the judgment denying the 27.26 motion also was affirmed. State v. Gray, Nos. 49,313, 52,502, Mo., 432 S.W.2d 593.

On March 4, 1969, the United States District Court for the Western District of Missouri, in a second habeas corpus proceeding, found that Dan Westley Gray had presented a question of ineffective assistance of appellate counsel in connection with the brief of Mr. Klemp in the consolidated appeals, Nos. 49,313 and 52,502, and ordered a hearing for determination of the question. Gray v. Swenson, D.C.W.D.Mo., 296 F.Supp. 1040. On July 22, 1969, the United States District Court for the Western District of Missouri found that Dan Westley Gray was entitled to the writ on the ground that he was, as a matter of law, represented by inadequate and ineffective counsel on his second direct appeal and that he had never been accorded a hearing on the voluntariness of his confession as envisioned by Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, but stayed execution of the writ upon condition that he be afforded an appropriate plenary evidentiary hearing in the state trial court in accordance with Jackson v. Denno, su-

pra, without limitation on his right to broaden the scope of inquiry by further 27.26 motions. Gray v. Swenson, D.C.W. D.Mo., 302 F.Supp. 1162, affirmed upon petitioner's appeal, Gray v. Swenson, 8 Cir., 430 F.2d 9. On September 8, 1969, this court, of its own motion and consistent with the foregoing authorities, vacated the judgment of October 25, 1968, affirming the conviction a second time and affirming the denial of relief on the first 27.26 motion, State v. Gray, Mo., 432 S.W.2d 593, supra, recalled the mandate of November 12, 1968, ordered the Circuit Court of New Madrid County to conduct a plenary evidentiary hearing in accordance with Jackson v. Denno, supra, on the voluntariness of defendant's confession, and appointed David E. Blanton as counsel for Dan Westley Gray.

On September 24 and September 29, 1969, orders were entered by the Supreme Court of Missouri, upon the disqualification of the Honorable Marshall Craig, transferring the Honorable William H. Billings to sit in the consolidated cases. On October 3, 1969, Judge Billings set the plenary evidentiary hearing for October 15, 1969, in order to comply with the time limitations set by the order of the United States District Court for the Western District of Missouri in Gray v. Swenson, 302 F.Supp. 1162, supra. On October 8, 1969, defendant moved for and secured a continuance pending disposition of his appeal from the order of 302 F.Supp. 1162. On October 28, 1970, following disposition of the appeal in Gray v. Swenson, 8 Cir., 430 F.2d 9, supra, on September 15, 1970, Judge Billings set the hearing for January 22, 1971; and, on January 22, 1971, the cause was continued to January 28, 1971. On January 28 and January 29, 1971, the evidentiary hearing was conducted and, on January 29, 1971, the court made findings of fact and entered judgment denying relief.

On February 8, 1971, movant filed his notice of appeal (Nos. 49,313 and 52,502), and, on June 15, 1971, while those appeals were being perfected, he filed, *pro se,* yet another motion under Rule 27.26 together with an application for disqualification of judge. On June 22, 1971, Judge Billings denied the motion and application without a hearing. On June 26, 1971, movant filed, *pro se,* a notice of appeal from this ruling and, on June 29, 1971, counsel also filed notice of appeal. On July 1, 1971, the appeal from denial of this last motion was docketed as No. 57,076; and, on July 28, 1971, this court, of its own motion, ordered appeal No. 57,076 consolidated with the appeals in Nos. 49,313 and 52,502, "which have heretofore been consolidated." On January 25, 1972, the consolidated appeals were argued and submitted, and the cause is once again before this court for review.

Appellant does not challenge the sufficiency of evidence to sustain his conviction. The statement of fact in State v. Gray, supra, 360 S.W.2d 1. c. 644, succinctly demonstrates the sufficiency of evidence, and the transcript of the original appeal justifies its reproduction as the statement of fact on this appeal.

"Sheriff Ramsey had a warrant for the arrest of defendant. Informed that defendant was at the home of his brother Bobby Gray, the sheriff and Cleatus Phillips, a deputy sheriff, went to the brother's home near Marston, traveling in a pickup truck. The sheriff went to the front door, Phillips to the back of the house. Phillips called out that he saw defendant inside the house. The sheriff called on defendant to come out. Defendant said 'Wait until I get the shirt on.' Time passed and defendant did not come out. The sheriff opened the front door, walked into the front room of the house, and heard a sound like a pump shotgun being pumped, in a rear room. Phillips kicked the back door open, and as Phillips was entering the house defendant shot Phillips in the head with a shotgun at close range, killing him instantly. The sheriff ran out of the house, ordered defendant to come out and throw down his gun, and fired into the air twice to scare him out.

Defendant left by the rear door, came around the house, encountered the sheriff at the corner of the front of the house, and shot the sheriff, the main load striking the sheriff in the left shoulder and chin, knocking out a tooth and a B-B blinding him in one eye. The sheriff ran around the house, saw Phillips' dead body lying on the ground, ran in the direction of the truck, encountered defendant, and the two men exchanged shots simultaneously, some of the shots striking the sheriff's arm. The sheriff ran into a cornfield. Defendant, with a shotgun in his hand, followed the sheriff. The sheriff took two more shots, emptying his pistol, ran toward a road, collapsed. Defendant approached the sheriff, who was weak from loss of blood and down on his hands and knees. The sheriff asked him not to shoot him. At defendant's instruction the sheriff threw his gun out on the road. Defendant then fetched the truck, loaded[1] the sheriff and the dead man in the back of the truck, and drove around through the woods and over the back roads, first starting to town to take the sheriff to a doctor, later changing his mind. Defendant took $61 from the sheriff, rolled the deceased over enough to remove his billfold from his hip pocket, and extracted the folding money, saying he wanted 'money to get an airplane ticket to get away on.' Defendant asked the sheriff for two days' time before informing on him, suggested that the sheriff say 'it was a nigger'; that if the sheriff 'liked his children' he had 'better say it's a nigger'; that if the sheriff would give defendant a chance to get away he would send him $10,000 within two months' time 'to fix [his] face up as good as new.' Defendant finally turned the truck over to the sheriff, who drove around until he found someone to take him to a doctor. Three days later defendant[2] was taken into custody in the vicinity by the highway patrol. The defense was self-defense."

The July 2, 1966, evidentiary hearing was conducted by Judge Craig on movant's grounds for relief of violation of Sections 476.290 and 476.300, and the use of an allegedly involuntary confession.

With respect to the first ground, it was stipulated that Hal E. Hunter, Jr., was both Clerk of the Magistrate Court and Assistant Prosecuting Attorney of New Madrid County during the period beginning with the shooting on September 12, 1960, and ending with his resignation as Clerk of the Magistrate Court one week prior to commencement of trial on September 21, 1961. At trial his only office was that of assistant prosecuting attorney under Prosecuting Attorney J. V. Conran.

Movant's evidence on the confession was presented through his own testimony and that of his brother, Bobby Gene Gray, his brother-in-law, James Muse, and Eula May Gray, former wife of movant. The thrust of their testimony was as summarized in appellant's present brief.[3] Dan Westley Gray "was taken into custody on the 15th day of September, 1960, in Pemiscot County; was taken to Sikeston, Scott County, by various officers of the law; was not advised as to his rights; was not allowed to make any telephone calls; was kept for approximately 6 hours; was given no food; and was surrounded by various officers of the law during this period of time. * * * that his family, mother, father, and wife, who he stated was pregnant, and some of his in-laws were incarcerated and that he was advised that they would be kept in jail until he made a statement as to the killing of Cletus [sic] Phillips. * * * that members of his family were * * * incarcerated in the jail at New Madrid."

The State presented its position through cross-examination of movant and his witnesses and by the trial transcript. The

---

1. With the help of his father, Bob Gray.

2. In possession of pistols belonging to Ramsey and Phillips and the murder weapon.

3. And supported by the transcript of evidence.

first mention of the statement came during defendant's direct testimony in his own behalf:

"[By Mr. Welker] Q When you were taken in custody, where were you taken? A Sikeston. * * * Q And there you were asked a series of questions, were you not? A Yes, sir. * * * Q * * * Do you remember who was there? A I do remember some of them, yes, sir. Q How many would you say? A There must have been ten or twelve. Q Did you have a friend in the bunch? A Well, yes, all of the highway patrol were friends of mine. Q Did they ask you anything about a previous relationship between you and Cleatus? A Yes, sir. Q Is it in this transcript anywhere? A No, sir. MR. WELKER: You may take the witness.

"CROSS EXAMINATION BY MR. HUNTER, JR.:

"Q D., you're telling us now you made this statement? A If it's the same statement, I did. Q May I show it to you? * * * THE WITNESS: Yes, it's the same one. It looks like it. Q (By Mr. Hunter, Jr.) That is the statement you made? A Yes, sir. (MARKED STATE'S EXHIBIT NO. 5 FOR IDENTIFICATION.) MR. WELKER: Did you read the statement after you gave it? THE WITNESS: Yes, part of it. MR. WELKER: You didn't read it all? THE WITNESS: No, sir. MR. WELKER: It consists here of 364 questions and twenty-two pages. You didn't read it all the way through? THE WITNESS: The road patrolman read it; no, sir. MR. WELKER: I belive that is all.

"THE COURT: Proceed with your cross examination.

"Q (By Mr. Hunter, Jr.) I'll call your attention to the last paragraph of that statement. (Reading) 'I Dan Wesley [sic] Gray have read all the foregoing statement from page one through page twenty two and it is the truth. I have not been threatened before or after making the statements. I have not been promised anything before or after making the statements. I am signing this as my voluntary account of my actions.'

"A You were there, Hunt. Q Was I there when you signed it? A You were there. Q Is that your signature? A Yes. Q You have any reason not to sign it? A No. Q Is it the truth? A To a certain extent most of the things I told in there was the truth all but one thing. Q What did you lie about, D? A About the housebreaking.

* * * * * *

"Q Trooper Thomas said, (reading) 'Do you want to say anything else that you may have left out?' And your answer was (reading) 'No, sir.' Is that right? A That's right. Q Now, D., I call your attention to page 2 of this statement.

"MR. WELKER: I'll agree if you want that we'll read the whole statement from start to finish."

With the case in this posture, Judge Craig denied relief, finding that the alleged violation of Sections 476.290 and 476.300 had been waived and so ruled on the original appeal; and that any use of the allegedly involuntary statement was by agreement and first used by the defense itself.

At the outset of the plenary evidentiary hearing conducted by Judge Billings, the order of the District Court in 302 F.Supp. 1162, 1170, was reviewed with particular emphasis on the recital that nothing in that opinion or order was to be "construed as any limitation on petitioner's right to file and the State trial court's duty to hear any new Missouri Supreme Court 27.26 motion which petitioner may wish to file in conjunction with the Jackson v. Denno hearing first ordered." Judge Billings then asked Mr. Blanton, "Are there any other matters that you have been advised of by your client, Mr. Gray, that he desires to have included in the 27.26 motion which is

now before the Court?" Mr. Blanton replied, "No, sir, there are no issues that I have been advised by Mr. Gray that should be included in an amended 27.26. It being my position, however, that in the event this matter is again before the Supreme Court, that then Judge Oliver's opinion would authorize the raising of various issues before the Supreme Court that should have been raised in an appeal on the merits, other than the issue pertaining to the statement that was taken and was used in cross-examination." Mr. Hunter then stated, "The State takes the position that if this man has any further matters to bring up having to do with his conviction, that he has a proper method of doing it by amending the 27.26, and this is the time to do it, rather than to have additional and future hearings." Mr. Blanton replied, "I don't anticipate any future hearings on 27.26's * * *." Counsel further indicated his understanding that the orders of the District Court and the Supreme Court placed him in representation of movant in the appeal of the conviction and the appeal of this collateral attack.

In order to resolve all question of the scope of the hearing, Judge Billings recited, " * * * this Court is going to grant both sides wide scope on any matters which they feel might be pertinent to a 27.26 hearing, including * * * not only * * * the matters set forth in the 27.26 motion, but which might be raised here today, anything in the constitutional nature."

The court then determined from Dan Westley Gray that he had been brought to New Madrid County and given sufficient time and opportunity to consult with counsel. He acknowledged that Mr. Blanton had not failed to comply with any request with respect to his representation, and that he was satisfied with Mr. Blanton.

The transcript of the evidentiary hearing conducted by Judge Craig was introduced as was the transcript of trial proceedings before Judge Weightman.

Movant presented his case by his testimony and that of his father, Robert Gray, his mother, Melissa Gray, his brothers-in-law, Carl Cummings and James Muse, his brother, Bobby Gene Gray, and his ex-wife, Eula Mae Montgomery. The thrust of such testimony may again be recited as summarized in appellant's brief.[4] Dan Westley Gray "at the time of the hearing was 43 years of age, was formerly married to Eula Mae Gray, a man with a third grade education who surrendered to the Highway Patrol just south of the New Madrid County line in Pemiscot County on September 15, 1960. He was removed to Sikeston zone office of the Highway Patrol; was transported in handcuffs and was interrogated for 6½ hours by Patrolmen, many in number with guns in their holsters, and was not given any food. He had no social or business acquaintance with the troopers and others that were at the zone office. Prior to the instant giving rise to the shooting he had been jailed by Cleatus Phillips and whipped while handcuffed to the bars in the New Madrid jail. He had been advised that various members of his family had been placed in jail and was further advised that they would not be released until he gave a statement. He was not advised that it was not necessary to give a statement, that he could remain silent, that a statement could be used against him or that he could get his own attorney or that the state would furnish him one. No one made an effort to protect his rights or advise him that he should have counsel. He was advised that phoning would not be necessary until they found out all of the details and that he could not call anyone. His paid attorney probably discussed the use of the statement but he did not know nor was he advised that he could object to the use of the statement and did not know of the existence of the Fifth Amendment and that he not knowingly waived any of his rights.

"On cross-examination he was unable to remember the substance of the heading and

---

4. And supported by the transcript.

concluding paragraphs of the statement that was signed by him and does not remember the contents of the same. There were several troopers present with guns but there were no threats made toward him. His attorney did not tell him he did not have to testify at the preliminary hearing or otherwise; and that members of his family had been picked up so that they could not help him.

"Interrogation by the Court disclosed that he did not remember if he went to any specific place between the 12th and 15th of September, 1960 and was most hazy of his recollection while under examination by the Judge and that Dampf or someone present told him, also Billy Meyers, now deceased, Deputy Sheriff advised him of the arrest of his family and upon being recalled by the Court he testified further that he had been advised of the arrest of his family by L. D. Studdie.

"His father Robert Gray, his mother Malissa Gray, brother-in-law Carl Cumings [sic], brother-in-law James Muse, brother Bobby Gene Gray and ex-wife Eula Mae Montgomery all testified that they were picked up on the 12th or 13th, a Monday or Tuesday, and kept in jail until the following Friday and were not tried for any offense nor were they told why they were arrested and put in jail. The state's evidence disclosed that they were arrested and charged with being accessories after the fact under Section 556.180 V.A.M.S. which the state admitted it could not prosecute under.

"Defendant's wife, Eula Mae, testified that while she was in jail she miscarried."

The State introduced the official files of the Circuit Court of New Madrid County in Cases 5408 and 5409. In No. 5408 Robert James Gray, Bobby Gene Gray, Eula Mae Gray, Melissa Gray, and Billy Gray were charged on September 13, 1960, with the felony of aiding and abetting the escape of D. W. Gray, charged with burglary and larceny. They were arrested and waived preliminary hearing on September 13, 1960, and made bond for appearances in circuit court on January 2, 1961. Information on such charges was filed in the circuit court on November 17, 1960. Also attached to such proceedings were an application for order to inspect statements filed on behalf of the defendants by their attorneys, Welker and Young, and a subpoena duces tecum issued by the circuit clerk May 9, 1961, requiring the prosecuting attorney to produce same. The record further shows subsequent dismissal of the charges. No. 5409 showed the same as to Zelma Elizabeth Marshall.

Testimony of the State's witnesses may also be recited as summarized in appellant's present brief.[5]

"Web Welker present Judge of the Probate and Magistrate Court of Madison County, an attorney of 55 years experience, 51 in actual practice, represented the defendant in the trial in September of 1961. Welker was a trial counsel in Poplar Bluff for 10 years, St. Louis trial attorney for 20 years, 16 years trial experience in Portageville and subsequent thereto has been the Judge of the Probate and Magistrate Court in Madison as above stated. He went over the copy of the statement in detail on several occasions with the defendant and advised the defendant as to his rights to testify or not to testify and defendant told him he wanted to testify and tell his story and his testimony at the trial was like the answers in the statement. Defendant advised him that he was not threatened or promised anything and that his statement was freely given and that the defendant was advised that he did not have to testify and that their defense was self-defense being on the fear that the defendant had of Cletus [sic] Phillips, the one who was shot. He in his direct examination of the defendant first made mention of the statement and that the defendant insisted that no objection be made of the use of the statement.

5. And supported by the transcript.

"The Special Judge examined witness Welker and brought out that he had participated in the defense of at least 20 murder cases and was very familiar with defendant's rights and that at no time did Gray advise him that he gave a statement because members of his family were in jail and he, Welker, had never heard of it until the day of the hearing presided over by Judge Billings. On redirect examination Welker testified that although the defendant was uneducated he was bright. He testified that none of the Gray family were prosecuted.

"Former Trooper Dwight Thomas, now Criminal Investigator for the U. S. Treasury Department, testified that he took the question and answer statement at the zone headquarters in Sikeston and there was present at the taking of the statement highway patrolmen and two newspaper men; that food was brought in, hamburger and soft drink, and he asked the defendant if he wanted to use the phone; advised the defendant of his rights and advised that he was not required to make a statement but if a statement was taken that it could be used against him; that he could have an attorney and that he was charged with murder and that he would listen if the defendant wanted to make a statement, and defendant said he would like to make a statement and tell his side of the story. He stated that the introductory clause setting out the defendant's rights were typed and read to the defendant and the statement was typed and the whole statement was retyped later and signed by the defendant at Sikeston. He testified that although all the troopers that were in the zone office and in the surrounding area outside had their guns in the holster no threats or promises were made to the defendant and he, Thomas, did not hear anyone tell the defendant that his family was in jail and no one told the defendant that his family would not be released until he gave a statement.

"On cross-examination Thomas stated that he heard Lt. Dampf advise the defendant as to his rights. This was before any statement was taken. There were about 15 troopers in and about the zone headquarters at Sikeston and that he explained to the defendant the substance of the introductory rights paragraph of the statement. The defendant was not advised that the state would furnish him with an attorney if he could not get one of his own.

"Upon examination by the Court Thomas reiterated that the defendant was given food and drink before the statement was discussed or taken and that the defendant was not held 6 to 6½ hours on interrogation. On cross-examination Thomas stated that various people talked to defendant at different times.

"Next Capt. E. F. Dampf, retired patrolman who was a Lieutenant back in 1960, testified that he directed the manhunt for the defendant, that he was assisted by Brooks, Hurst, Dicson who brought out the defendant from hiding when he was taken into custody and that no one questioned the defendant prior to the statement given in Sikeston. He stated that the defendant was taken to Sikeston in two cars, a change being made on the way, and while there, prior to the statement defendant was advised as to his rights by witness Dampf and witness Thomas and defendant stated that 'Those people were trying to kill me. I want you to hear my side of the story'. Dampf said he told defendant he did not have to make a statement and if he made one it could be used against him and that he had the right to have an attorney and this in substance was repeated by Thomas. He testified that the defendant stated that he wanted to give his side of the story. Dampf heard no one tell defendant that members of his family were in jail and would not be released until a statement was made by him.

"On cross-examination Dampf stated that there were many troopers milling around zone headquarters and all were armed. He does not know that he told the defendant he had a right to remain silent

or that he could get an attorney or that the state would furnish him one. At that time it was not the general practice to advise people in custody that they could get an attorney or the state would furnish them one. Dampf knew that the defendant's family was in custody but did not hear anyone discuss this with the defendant and he said that the defendant was talkative and stated he wanted to tell his side of the story.

"Bob Stanard, a reporter for the Daily American Republic of Poplar Bluff, was present in the interrogation room at all times and he stated that he did not hear Lt. Dampf advise the defendant of his rights but he did hear Trooper Thomas tell the defendant that he was under arrest for murder, that he could have an attorney and that if he made a statement it could be used against him. He did not hear anyone tell the defendant that his family was in custody and that they would not be released until the defendant gave a statement. It took about three hours to give the statement. This witness said he heard no request by the defendant to use the phone to call his sister in St. Louis or to call an attorney.

"Next Norman Copeland testified that the defendant was asked if he was hungry and food was furnished. Thomas explained to the defendant his rights and what was in the statement and there were no threats or promises made. The defendant stated that he wanted to tell his side of the story. He heard no one advise the defendant that his family was in custody and that they would not be released until the defendant gave a statement. Gray was taken to Benton on the night of the 15th and returned to Sikeston the next day where the statement was signed and the defendant had a copy of the statement at the time it was read to him by Thomas. There was no request at any time to use the phone.

"Gene Harris, 31 years with the Highway Patrol, was present when the defendant was taken into custody. He drove the defendant part of the way to Sikeston; there was no interrogation of the defendant prior to that in the Sikeston zone office. He was present at the giving of the statement. He heard Lt. Dampf discuss the defendant's rights with him and heard Thomas read the rights paragraph of the statement to him and he was present when the defendant signed the statement on the 16th. The defendant had a copy of the statement at the time it was read to him. There were no threats or promises made and he did not hear anyone advise the defendant that his family was in jail. On cross-examination he stated no one told the defendant that he had the right to remain silent or that the state would get him an attorney. He stated that the defendant had no friends at the interrogation and there was no request by the defendant to use the phone.

"James J. Bloomfield, Juvenile Officer of New Madrid County, rode in the car part of the way with the defendant to Sikeston and there were no statements made on the way to Sikeston. He stated that Dampf asked the defendant if he wanted to make a statement and the defendant said he wanted to tell his side of the story. He does not recollect the exact words used in advising the defendant of his rights but there were no threats or promises and no one advised the defendant that his family was in custody. He heard no request for the use of the phone. He heard Lt. Dampf advise the defendant he did not have to make a statement and had the right to have an attorney but he was not told he had the right to remain silent or that the state would furnish him with counsel. He stated that the interrogation lasted 2½ to 3 hours.

"Zelma Marshall, cousin by marriage to the defendant, testified that the defendant came to her house and had lunch there and left out through the fields. She stated that she was in jail from Tuesday to Friday, she was not told why she was there and she was not prosecuted. The defendant had told her of the shooting of Phillips.

"Hal E. Hunter, Jr., Prosecuting Attorney, was called as a witness by the Court and stated that there was no conversation with the defendant from New Madrid to Sikeston, the defendant was given food after arriving in Sikeston, hamburgers and soft drink, which the defendant ate some of and there was no questioning prior to the food offer. Lt. Dampf told the defendant he did not have to make a statement but if he wanted to that he would listen, that he could have an attorney, and the defendant said 'You've only heard the other side, I want you to hear my side.' Trooper Thomas typed the statement and read the rights paragraph to the defendant. Defendant made no request to use the phone to call his sister or an attorney. He did not hear anyone advise the defendant that his relatives were in jail and no threats or promises were made. A warrant had been issued charging the defendant with burglary and larceny prior to the shooting. He further stated that he knew of no one who had told the defendant that his family was in jail.

"Capt. Wayne C. Brooks who was present at the time the defendant was taken in custody and the defendant said 'Don't shoot me, please don't shoot me.' Defendant was handcuffed and put in a patrol car. Defendant travelled in Brooks car to the area of New Madrid and then transferred to Trooper Harris' car to go to Sikeston. Brooks heard no threats or promises made nor did he hear anyone tell the defendant that his family was in custody. Capt. Brooks heard no one advise defendant of his rights in his presence at any time.

"Troopers Hurst and Dickson both testified that they did not advise the defendant as to his rights nor did either of them advise the defendant that his family was in jail."

Upon this whole record, and in denial of relief to movant, Judge Billings made some forty-six exhaustive, comprehensive findings of fact, e. g.: "That since August 24, 1960, the New Madrid County authorities had been searching for Petitioner for the purpose of arresting him on charges of burglary and larceny; * * * That after the killing of Deputy Phillips on the morning of September 12, 1960, the Petitioner was aided and assisted in avoiding arrest and apprehension for burglary and larceny and the charge of murder by his father, his then wife, Zelma Marshall, and possibly other relatives and friends; That Petitioner's father, mother, wife, two brothers, and Zelma Marshall were arrested by officers for aiding and assisting Petitioner as aforesaid on September 12 and 13, 1960; That said persons waived their preliminary hearing on said charges in the Magistrate Court of New Madrid County, Missouri, on September 13, 1960, and were bound over to the Circuit Court of New Madrid County; That said persons were released on bond on September 16, 1960; That charges against the individuals were nolle prossed by the State on May 23, 1961; That between the shooting on September 12, 1960, and Petitioner's arrest on September 15, 1960, he received some food, changes of clothing, and rested and slept at various places; That Petitioner was taken into custody about mid-morning of September 15, 1960, by Missouri Highway Patrol Officers Brooks, Hurst, and Dickson near Portageville; * * * That enroute, and for security reasons, the Petitioner was transferred from the patrol car driven by Officer Brooks to a patrol car driven by Sergeant Harris; * * * That upon arrival of the Petitioner at the Missouri Highway Patrol Zone Office he was advised by then Lieutenant Dampf of the Missouri Highway Patrol that he did not have to make any statement, and that any statement that he might make could be used against him; That immediately upon arriving at said Zone Office the Petitioner, in the presence of officers and newspaper personnel, stated that he wanted to tell his side of the story; That before any questioning or interrogation of the Petitioner took place, food and drink was ordered and given to the Petitioner; That approximately thirty minutes after his ar-

rival at the Zone Office of the Missouri Highway Patrol in Sikeston, and after being fed, the Petitioner was told by Officer Thomas of the Missouri Highway Patrol that he did not have to make any statements, that he was under arrest for murder, and that any statement he might make could be used against him in a court of law, and that Petitioner was further advised that under the Constitution of the United States of America and the State of Missouri he had the right to have legal counsel if he so requested; That the period of time at the Zone Office of the Missouri Highway Patrol from the time that Petitioner arrived at that Zone Office until he was removed therefrom was a period of approximately two to three hours; * * * That during no time that the question and answer statement was being given, or prior thereto after the Petitioner had arrived at the Zone Office, did anyone tell the Petitioner that members of his family had been placed under arrest and were incarcerated in jail, nor did anyone tell the Petitioner that members of his family would remain in jail until he had 'confessed' to the killing of Deputy Phillips; * * * at no time while Petitioner was in the Zone Office of the Missouri Highway Patrol at Sikeston did he make any requests to use the telephone for the purpose of calling his sister in St. Louis, an attorney, or anyone else; * * * there were no promises, threats, duress, mistreatment, representations or coercion involved in the Petitioner making the statement referred to in the trial of the case; * * * the original of this statement was read to him by Officer Thomas, and that the Petitioner followed Officer Thomas' reading of the statement as Officer Thomas read the original; That thereupon the Petitioner freely and voluntarily and in the presence of witnesses, signed said statement; * * * That thereafter Attorney Web Welker and Gene Young, members of the Missouri Bar, and attorneys practicing in Portageville, Missouri, were employed as retained counsel to represent the defendant in the trial of his case; * * * that the Honorable Web Welker was at the time of trial, and before, an experienced, competent, learned trial attorney, who had wide experience in both civil and criminal trials; That Attorney Welker was furnished a copy of the statement given by the Defendant or the Petitioner, and that Attorney Welker on numerous occasions had gone over this statement with the Petitioner; That the Petitioner had advised his attorney that he wanted to use the statement, that this was his story as to what happened, and that in connection with the trial strategy Attorney Welker explained to the Petitioner that he had a right not to take the witness stand in his behalf, but that the Defendant advised Attorney Welker he desired to take the witness stand in his behalf to tell his side of the story as reflected in the statement; * * * that the statement in question is in fact exculpatory in nature, self-serving, and is consistent with and substantially the same as the testimony given by the Petitioner on direct examination in the trial of the case; That near the end of Petitioner's direct examination, and as part of trial strategy to corroborate Petitioner's trial testimony, his attorney referred to and asked about the statement; That thereafter the statement was used by the Prosecuting Attorney, Mr. Hunter, during his cross-examination of the Petitioner, and that thereafter the statement was again used by Petitioner's attorney on redirect examination; * * * that although the Petitioner had not had the benefit of very much formal schooling, that he is of average intelligence, that he had no difficulty with his memory at the trial of the case, that he has shown no difficulty with his memory as to certain aspects of this hearing where his memory would tend to support the allegations contained in his motion to vacate; The Court finds, however, that there are many inconsistencies and contradictions between his trial testimony, his 27.26 hearing before the Honorable Marshall Craig, and his testimony in this hearing, and that in fact there have been inconsistencies and contradictions between the Petitioner's tes-

timony yesterday and his testimony today; * * * The Court further finds that at the time of the trial of this case Mr. Hunter was no longer the Clerk of the Magistrate Court of New Madrid County; The Court therefore finds beyond a reasonable doubt that the 354 question and answer statement of Petitioner referred to in his trial and conviction, and in his motion to vacate, was constitutionally and voluntarily given and made by the Petitioner, that said statement was free of any unconstitutional taint of fear, coercion, either physical or psychological, threats, promises, duress, representations, mistreatment, overpowering of Petitioner's will, or illegal restraint, and, therefore in the totality of the circumstances said statement did not violate any of the Petitioner's constitutional rights; The Court further finds beyond a reasonable doubt that Petitioner is not a credible witness, and his testimony in support of the allegations contained in his 27.26 motion concerning the making of the statement is not worthy of belief; The Court further finds beyond a reasonable doubt that Petitioner had the effective assistance of retained counsel during his trial, and that the injection of the statement into the trial by Petitioner's competent, experienced, and fully qualified attorney, and the latter's failure to object to the use of said statement during cross-examination of Petitioner, and the further use of said statement on redirect examination of Petitioner was as a result of a decision made by Petitioner after full and complete consultation with his competent attorney, and, therefore Petitioner intentionally, understandingly, and knowingly participated in the trial strategy of the use of the statement in support and corroboration of his testimony and theory of defense; The Court further finds and determines that insofar as the 27.26 motion of Petitioner, that Petitioner has wholly and completely failed in his burden of proving his alleged grounds for relief by a preponderance of the evidence, and relief under Rule 27.26 is therefore denied."

The transcript in No. 57,076 shows the motion filed after the foregoing hearing. It sought to disqualify Judge Billings and asserted as grounds for relief under Rule 27.26 that: "Movant was deprived of due process of the law, in that, he did not have a fair and impartial jury at the time of his trial, in that movant personally knew each and every juror that was selected to try movant, violating movant's rights under the Sixth and Fourteenth Amendments of the U. S. Constitution and in violation of the Missouri Constitution and contrary to Section 494.020 RSMo 1969 [and] Movant was denied due process of the law, in that, in movant's trial for the shooting and wounding of Sheriff Ramsey, movant was acquitted by a jury on a verdict of 'Not Guilty By Reason of Self-Defense' (the shooting of Sheriff Ramsey arose out of the shooting and death of Deputy Phillips, all were in the same instance), therefore, requiring a new trial in cause number 5404. In other words, movant claims new evidence, which would in fact show and prove that movant shot and killed in self defense of his own life; that under newly discovered evidence, which was discovered after the trial of movant on the murder charge, the Court should grant a new trial."

By way of supporting facts to the first ground, movant asserted he "had in fact hunted with every juror * * *. The fact that movant was acquainted with the whole jury is enough to overturn this illegal conviction." On the second ground, he asserts "newly discovered evidence" without any description of same and recites his subsequent acquittal on the charge of shooting Sheriff Ramsey "By Reason of Self Defense."

This motion was denied summarily, without hearing, on findings "that Dan Westley Gray has heretofore filed a Motion to Vacate Judgment and Sentence pursuant to Rule 27.26 * * * and that the ruling of the trial court is now on appeal * * *, and * * * that petitioner has hereto-

fore filed a Disqualification of Judge in connection with the aforesaid Motion * * *."

Appellant's first three points on this appeal are general assertions: I. The courts have the duty to protect the basic rights of an accused to see that he has a fair trial. State v. Blakely, Mo., 438 S.W.2d 262, 265[2]. II. The defendant, though represented by an attorney of his own selection, nevertheless is entitled to a fair trial with all of his rights being protected and a third or fourth-grade educated lay defendant should not be held to have waived any of his rights by failure to have an objection if his rights were prejudiced by the failure of his attorney to protect him. Johnson v. Zerbst, 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461. III. A third or fourth-grade educated defendant should not have his conviction affirmed when all the issues are held to have been waived, when the defendant could not knowingly have waived any such rights. Sims v. Georgia, 389 U. S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634; Fay v. Noia, 372 U.S. 391, 399, 83 S.Ct. 822, 9 L.Ed.2d 837.

The argument on these points shows that these three assertions are directed against previous opinions of this court in which certain points were ruled to have been waived. Such caveats are unnecessary because those decisions have been set aside and, as will be seen, waiver will not figure in the rulings of any of the contentions on this appeal.

■ Point IV is appellant's contention with respect to the alleged violation of Sections 476.290 and 476.300. This contention is based on defendant's trial motion to deny Hal E. Hunter, Jr., the right to proceed further as assistant prosecuting attorney for the reason that at the time of the filing of the information he was also clerk of the magistrate court in which the preliminary hearing was held and that, as such, he was debarred from acting as prosecuting attorney; and a subsequent motion to strike the information.

There is no question that Hal E. Hunter, Jr., signed and filed the information as assistant prosecuting attorney, and on that date he was also clerk of the magistrate court. Section 476.290, supra, provides that no clerk shall plead, practice or act as an attorney in any court within the county for which he is clerk; and Section 476.300, supra, provides that any suit commenced or paper filed in violation of the preceding section shall be stricken. Mr. Hunter resigned as magistrate court clerk a week before trial began, and the motion to bar him from proceeding as prosecuting attorney came after two witnesses had testified at trial. At the time he was not acting as clerk and, consequently, was not prohibited from proceeding as prosecuting attorney.

■ The second portion of this point is the subsequent motion to strike the information on the same ground. Section 545.030, V.A.M.S., provides that no information shall be deemed invalid, nor shall the trial judgment or other proceedings thereon be stayed, arrested, or in any manner affected for any defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant on the merits. No defect appears in the information by virtue of its filing in violation of Section 476.290, supra. Neither does any defect appear tending to prejudice the substantial rights of the defendant. Consequently, it may not be said that the court erred in overruling defendant's in-trial motion to quash the information on the asserted ground.

■ Appellant's Point V is that he did not have a fair trial because the jury panel and jurors were not defendant's peers. The argument is that the jury was selected by two attorneys who were acquainted with the temperament of the area following the shootings, and that it is not shown whether any were of third or fourth-grade education and subject, as was defendant, to his asserted fear of the deputy sheriff. He would liken his argument to the situation of systematic exclusion of black people

from the trial of a black person discussed in Whitus v. Balkcom, 5 Cir., 333 F.2d 496, and Sims v. Georgia, supra.

■ The defendant's right is to a jury, not necessarily of his cultural and educational background, but to a jury which is selected by a process which does not systematically exclude members of his cultural and educational background. Whitus v. Balkcom, supra, and see discussion of this philosophy in Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664. In this case, the jurors were necessarily from defendant's own county since he chose to try his case there; and in his last motion he characterizes them as men with whom he was acquainted and had hunted. Surely, he did not make a practice of picking his enemies as hunting companions, and it is reasonable to believe he would have been attracted to them and similar to them in background because of their similar interests. Contrary to appellant's assertion, on this record it appears that his jury was truly composed of his peers.

■ Appellant's Points VI, VII, and VIII are related in asserting trial error in failure to pass on the voluntariness of defendant's statement; error in permitting the described use of the statement; and error in not giving an instruction to the jury on the circumstances relative to the statement.

The principal question for determination at the plenary evidentiary hearing conducted by Judge Billings was whether defendant's statement was voluntary. The hearing was ordered to gain compliance with requirements of Jackson v. Denno, and this record demonstrates not only a full evidentiary hearing for that purpose, but to inquire into any other aspects of his trial that movant wished to cover as well. The court has made numerous findings of fact in determining the statement to have been made voluntarily and, on this record, such

findings and determination are amply supported. Some conflict in the evidence is raised by movant's testimony, but the court resolved the conflict and, in particular, determined that movant's version of the circumstances surrounding the statement was not credible. Accordingly, on this record it may not be said that the finding on the issue of voluntariness is clearly erroneous. Since the statement was voluntary, the use [6] made of it at trial did not constitute trial error.

Appellant's Point IX is an amplification of his argument on Points VI, VII, and VIII. He contends, specifically, that he was not fully advised of his right to remain silent and his right to have a lawyer appointed if he desired a lawyer but could not afford one. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

It is clear from the evidence quoted from appellant's brief that Dan Westley Gray was advised of his right to remain silent and that he did not have to make a statement. Accordingly, the assertion in his argument to the contrary is without merit.

■ It is equally clear that defendant was advised of his right to have a lawyer, and the record shows that he was not advised of the right to have a lawyer appointed for him if he desired but could not afford one. This interrogation and trial occurred prior to Escobedo v. Illinois, supra, and Miranda v. Arizona, supra, and the procedural requirement of offering to appoint counsel for an indigent in those cases is applicable only to trials commenced after their decision. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. Accordingly, the issue of voluntariness in this case depended on the "totality of circumstances" and the court was to determine whether they deprived defendant of a free choice to remain silent

6. Note that the statement was never admitted in evidence, but was used only as described for purposes of direct and cross-examination of defendant.

or to answer questions and whether physical or psychological coercion was present to an extent that defendant's will was overborne. Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433; State v. Smith, Mo., 415 S.W.2d 748, 750[1]. As previously suggested, this record shows that the defendant wanted to tell his side of the case; that he was advised of his rights to remain silent and to have a lawyer; and that there was an absence of any kind of coercion, threat, or promise. Accordingly, the court properly found defendant's statement voluntary under the totality test.

■ Appellant's Point X charges trial error in permitting Sheriff Ramsey to testify to his own shooting at the time the killing of Deputy Phillips occurred. The argument is that this is evidence of a separate offense and therefore not admissible. State v. Mathis, Mo., 375 S.W.2d 196. Appellant also argues that this had a damaging effect in his trial for killing Deputy Phillips because he was later acquitted on the ground of self-defense on the charge of shooting Sheriff Ramsey.

There are exceptions to the general rule cited by appellant. One such exception occurs when evidence of the other crime is part of the res gestae. The record shows that the shooting and wounding of Sheriff Ramsey occurred within moments of the killing of Deputy Phillips and that it, too, arose from the officers' effort to arrest defendant for another crime. As such, the second shooting was admissible as a part "of a continuous occurrence intimately connected with the crime for which defendant was being tried." State v. Bell, 359 Mo. 785, 223 S.W.2d 469, 471[1]

■ With respect to the final motion filed by Dan Westley Gray, the trial court quite properly refused disqualification because movant already had had a change of judge on his collateral attack motions when, on remand, Judge Craig was disqual-

ified, and he is entitled to but one such disqualification. Criminal Rule 30.12, V.A.M.R.; State v. Cline, Mo., 477 S.W.2d 91, 1972.

The allegation with respect to denial of a fair trial on account of a trial by jurors whom he knew has been ruled under Point V.

■ The allegation dealing with newly-discovered evidence fails to recite or describe any new evidence which would meet the test for granting a new trial on that ground. State v. Brotherton, Mo., 266 S.W.2d 712. The acquittal on the charge of shooting Sheriff Ramsey mentioned with this allegation does not meet such test.

If by this allegation, movant was alluding to some other undescribed evidence, the existence of same was not made known to counsel nor could counsel bring such into existence. In candor, appellant's brief recites "counsel has put forth every effort to locate witnesses who could testify on the defendant's behalf with reference to the issue of self-defense and with reference to the deceased Deputy Sheriff having handcuffed the defendant to the jail bars and beating him with jail keys. The court appointed attorney * * * has conferred with the defendant's brother who has thus far not come up with anyone who could assist other than the hearsay contention that there was a young lady who had kept company with the defendant and with the deceased * * * and the Deputy Sheriff is alleged to have told her that if he caught her with the defendant he would kill the defendant. * * * she died last year."

This decision of these three appeals is of considerable length; however, in view of the history of the case, it is appropriate to go to the extent necessary to demonstrate that appellant has received not only a fair and impartial trial with representation by effective and capable lawyers of his own choosing, but also full review of same both

in the trial court and upon appeal with the effective assistance of appointed counsel.

Judgments affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.