STATE of Missouri ex rel. Linda Mae BRAULT, Relator,

v.

Honorable Harold A. KYSER, Judge, Juvenile Division, Circuit Court of Henry County, Missouri, 27th Judicial Circuit, Respondent.

No. KCD 29682.

Missouri Court of Appeals, Kansas City District.

Jan. 30, 1978.

James L. Muller, Kansas City, for relator.

William J. Cason, Clinton, for respondent.

Before SWOFFORD, C. J., and SHANGLER, DIXON, PRITCHARD, WASSERSTROM, SOMERVILLE and TURNAGE, JJ.

WASSERSTROM, Judge.

The question for determination in this case is whether the relator mother is entitled to a change of judge in this proceeding to terminate her parental rights. The respondent trial judge held not, and relator filed application in this court to prohibit respondent from proceeding further. We granted a preliminary rule in prohibition and now make that rule absolute.

On December 19, 1972, the juvenile officer of Henry County initiated proceedings by a petition under Section 211.031 [1] to have the juvenile court take jurisdiction of Sheryl Ann Trapp and three siblings as neglected children in need of care and treatment. This proceeding was given case number J—

1. All statutory references are to RSMo 1969.

887. Judge Kelso Journey entered an order on that petition on January 2, 1973, finding the children to be neglected, making them wards of the juvenile court, and placing them in the care of the Department of Welfare.

On January 3, 1974, the juvenile officer filed another petition in the same case number J–887, this petition having as its goal the termination of parental rights under Section 211.441. The trial was held on the issue of terminating the parental rights of the natural parents, and judgment terminating those rights was entered on April 29, 1974. The parents appealed that judgment, and this court reversed in In Re Trapp, 528 S.W.2d 489 (Mo.App.1975). However, during pendency of the appeal the Division of Family Services placed Sheryl Ann with David Lee and Judy Elaine Bridgeman, who filed a petition for adoption, and Judge Journey entered an order granting them temporary custody pursuant to that petition.

Thereafter on December 27, 1975, after the decision of this court, relator and her husband filed a motion to set aside the order of January 2, 1973, or in the alternative for a hearing on the restoration to them of the custody of the children; and on April 15, 1976, they moved in the adoption case for vacation of the order of temporary custody to the Bridgemans. On April 26, 1976, Judge Journey did set aside the temporary custody of Sheryl Ann and revested custody of her in the Division of Family Services. The next day the Bridgemans filed a motion for leave to intervene in case No. J–887, which motion was accompanied with their proposed petition to intervene which included a prayer for termination of the rights of the natural parents. The Bridgeman motion for leave to intervene was granted on April 28, 1976. The parties engage in extensive dispute on this appeal as to the effectiveness of the latter order, in part based upon relator's insistence that proper notice of the application was never given to her and because the order of April 28, 1976, was entered ex parte. That question need not be pursued for the reason that even if it be assumed that the leave to intervene was properly granted, that does not change the ultimate issue or in any way alter the disposition to be made on this writ.

On April 29, 1976, relator and her husband filed a motion for change of judge. She insists that at the time that motion was filed neither the movants nor their attorney had any knowledge, actual or constructive, that the Bridgemans were trying to bring before the court a renewed effort to terminate parental rights of the natural parents. However, even if they could be held to such knowledge, that would be immaterial. Their motion was not required to nor did it ask for a change of judge as to all matters then pending or contemplated under case number J–887. Rather their motion applied for a change of judge only "on their Motion (1) to Set Aside Custody Order of January 2, 1973; (2) to Set Aside Support Order of February 27, 1973; and (3) in the Alternative, for a Hearing to Restore Custody of Children to Natural Parents." That motion for change of judge was sustained by Judge Journey on May 28, 1976, and in due course the Missouri Supreme Court assigned Judge H. A. Kelso in place of Judge Journey.

On June 15, 1976, the parents moved to set aside the order granting leave for the Bridgemans to intervene and for a new order denying the intervention. That order was never called up and the case languished until February, 1977. In that month, the Bridgemans tacitly abandoned their original intervention and filed a new motion to intervene. Then, on February 22, 1977, Judge Kelso having retired, the Missouri Supreme Court returned jurisdiction of this case to Judge Kyser, respondent herein, who was Judge Journey's successor in office.

Following this, on April 29, 1977, the juvenile officer filed in case number J–887 a new petition to terminate parental rights. In response to that, relator filed a new application for change of judge. Respondent denied that application on June 10, 1977. Relator's application for writ of prohibition followed.

Respondent refused the last requested change of judge and resists this writ on the ground that relator already had one such change of judge on May 28, 1976, and she is barred from a second change by Rule 51.-05(d).[2] Relator answers by saying that the petition filed by the juvenile officer on April 29, 1977, constituted a new and distinct proceeding as to which she had never had any previous change of judge. The issue therefore narrows down to whether everything filed under case number J–887 is a single proceeding in which only one change of judge is allowed to either side, or whether the petition to terminate parental rights filed by the juvenile officer on April 29, 1977, is to be considered a proceeding separate from the neglected children case already pending under that number.

■ An analysis of Chapter 211 leads to the conclusion that the two proceedings are separate, as relator contends. Proceedings pertaining to neglected children are covered by Sections 211.031–211.431. In careful contrast, provisions pertaining to the termination of parental rights are grouped together as Sections 211.441–211.511 and are specially marked off with the subheading "Termination of Parental Rights."

Not only are these two sets of provisions sharply divided by distinct separation and specific headings, but each has a fundamentally different purpose. The neglected child provisions contemplate only a temporary shift of custody and leave the underlying parental rights intact. On the other hand, Section 211.441 et seq. contemplates a complete and permanent rupture of the family relationship. The Missouri decisions recognize the vast difference between these two procedures. *In Re S-M-W*, 485 S.W.2d 158, 164 (Mo.App.1972); *S.K.L. v. Smith*, 480 S.W.2d 119, 124 (Mo.App.1972); *In Re C____*, 468 S.W.2d 689, 691 (Mo.App.1971). In view of what these cases describe as the "awesome power" under Section 211.441, a much stronger test for parental default is prescribed by that section than is required under the neglected child provision, Section 211.031. The difference between the two procedures is further and very dramatically shown by contrasting Section 211.481, which provides that a parent may demand a jury trial when the proceeding is to terminate his parental rights, whereas the public is wholly excluded under Section 211.171.5 in the more routine neglected child type of proceeding. The separate and distinct nature of the type of proceeding under Section 211.441, which so clearly appears from the foregoing analysis, has been expressly recognized in *In Re S-M-W, supra*, which states with respect to the provisions dealing with termination of parental rights: "That body of laws is a complete code within itself * * *."

The juvenile officer's petition filed on April 29, 1977, raised a new issue and sought distinctly different relief from what was before the court immediately prior to that filing. The resolution of this new issue required a different hearing procedure. To all intents and purposes, this petition instituted a new and different "civil action" within the meaning of Rule 51.05(d) and permitted a fresh application for change of judge. See *Hayes v. Hayes*, 363 Mo. 583, 252 S.W.2d 323 (1952); and *State ex rel. Interstate Motor Freight System, Inc. v. Hall*, 409 S.W.2d 678 (Mo. banc 1966).

■ Respondent argues that the petition dated April 29, 1977, arose out of the same controversy as the matters already pending in case number J–887 and that therefore the petition of April 29, 1977, should be considered a compulsory counterclaim under Rule 55.32(a). Relevant to this argument, respondent cites *Griggs v. Miller*, 374 S.W.2d 119 (Mo.1963), for the proposition that the filing of a counterclaim does not give rise to a right by the defendant to file a second request for change of judge.[3]

---

**2.** That rule becomes applicable by reference through Rule 110.04.

**3.** *Griggs* differs from the present case in that the defendant there sought to justify a second change of judge by reason of his own pleading of new matter by way of counterclaim. In contrast, relator here seeks a second change based on her *opponent's* introduction of a new and different proceeding.

One difficulty with respondent's argument lies in its assumption that Rule 55.32(a) applies to juvenile court proceedings. Not so. Rule 110.04 imports into these proceedings the general rules of civil procedure only to the extent those rules are not inconsistent with the special rules contained in the Rules of Practice and Procedure in Juvenile Courts, Rules 110 to 128. Important to the present point, Rule 114.03 provides that no party is even required to file a responsive pleading, which negates any notion of requiring counterclaims. Indeed, the whole concept of counterclaims would be inappropriate and incongruous in juvenile proceedings.

Stated somewhat differently, the situation here does not fit the counterclaim pattern. Relator had no affirmative claim on file which could serve as a predicate for a counterclaim by the juvenile officer. Immediately prior to the juvenile officer's filing of his petition on April 29, 1977, to terminate parental rights, the only application for affirmative relief pending was the neglected child petition which had been filed by a previous juvenile officer. Relator had nothing on file except a motion to undo the orders which had been entered at the juvenile officer's request in the neglected child proceeding, and in which she sought "reinstating the natural and normal parent and child relationship." *In Re I.M.J.*, 428 S.W.2d 18, 22 (Mo.App.1968). In other words, there was no proceeding on file instituted by relator to which the juvenile officer's petition of April 29, 1977, could be considered as a counterclaim.

In reality, respondent argues for a mandatory joinder of actions by the juvenile officer. This would make good sense if non-joinder would result in the splitting of what constitutes a single cause of action. However, as already discussed at length in a previous part of this opinion, a neglected child case and a termination of parental rights case are fundamentally separate and distinct and cannot be lumped together as one single cause of action.

Respondent also cites *Dagley v. Dagley*, 270 S.W.2d 553 (Mo.App.1954), and *State v. Gray*, 478 S.W.2d 654 (Mo.1972). The type of proceedings in these cases were completely different from what is here involved and the attempted analogies are not persuasive.

The rule is made absolute and respondent is prohibited from taking any action under the petition filed April 29, 1977, other than to grant relator's request for change of judge to hold the proceedings thereunder.

All concur.