In the Interest of S.M.H., a minor.

Missouri Department of Social Services, Division of Family Services, and Juvenile Officer, Respondents,

v.

T.H., Jr., Appellant.

No. SC 86440.

Supreme Court of Missouri, En Banc.

March 15, 2005.

Michele Hammond and Francis J. Murphy, III, St. Louis, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., James H. Klahr and Gary L. Gardner, Asst. Attys. Gen., Jefferson City, MO, Margaret E. Gangle, St. Louis, MO, for Respondents.

Ashley R. Beumer, St. Louis, MO, Amicus Curiae.

LAURA DENVIR STITH, Judge.

T.H., Jr., (Father) appeals the termination of his parental rights to his daughter, S.M.H. He alleges that the trial judge erred in failing to grant his motion for change of judge under Rule 126.01 and, further, that there was insufficient evidence to support the termination. This Court holds a petition to terminate parental rights is a "supplemental petition" for purposes of Rule 126.01. As such, Father was not entitled to a change of judge under Rule 126.01 upon the filing of the petition to terminate his parental rights where, as here, the petition was to be

heard by the same judge who heard the earlier petition. This Court also holds that the record does not support the judge's termination of Father's parental rights. The judgment, therefore, is reversed, and the case is remanded.

## I. THE MOTION FOR CHANGE OF JUDGE WAS UNTIMELY

 Before setting out the facts underlying the termination of Father's parental rights, this Court must address his claim that the trial court had no authority to try the termination of parental rights proceeding in the first instance. If that is the case, then the Court need not reach the other issues, but must remand with directions to transfer the case to another judge for hearing.

The initial petition, asking the circuit court to take jurisdiction over S.M.H. and place her in the protective custody of the Division of Family Services (the Division) was filed in the spring of 2001. It was assigned to Judge Frawley, who presided over an adjudication of the allegations of the petition in June 2001. Father did not move for a change of judge at that time. In August 2003, Judge Frawley directed the Division to file a petition to terminate Father and Mother's parental rights. The Division filed that petition on September 8, 2003, under the same case number as had been assigned to the prior petition. On November 4, 2003, the petition to terminate parental rights was set for trial. On November 10, 2003, Father moved for a change of judge. The motion was overruled as untimely.

Father asserts that his change of judge application was timely under Rule 126.01 because it was filed within five days of the time the petition to terminate his parental

rights was set for trial. The Division argues that it was untimely because the period for filing it ran from the time Judge Frawley was initially assigned to hear the petition adjudicating S.M.H.'s custody and a new time period for requesting a change of judge did not begin to run merely because a petition to terminate Father's parental rights was filed.

Because the timeliness of Father's motion under Rule 126.01 is an issue of law, this Court decides it *de novo*. *Junior College District v. City of St. Louis*, 149 S.W.3d 442, 446 (Mo. banc 2004). Rule 126.01(a) permits a change of judge without cause, stating in relevant part:

(a) A change of judicial officer of the court shall be ordered:

. . . .

(2) upon application of a party. The application need not allege or prove any cause for such change of judicial officer and need not be verified.

Rule 126.01(a)(2).[1] Rule 126.01(b) provides limits on the time for requesting such a change of judge, however. It states that:

(b) The application must be filed within five days after a trial date has been set, unless the trial judicial officer has not been designated within that time, in which event the application must be filed within five days after the trial judicial officer has been designated . . . .

Rule 126.01(b). Here, while Father filed his motion within five business days of the time that the petition to terminate parental rights was set for trial before Judge Frawley, he did not file it until some 18 months after the judge heard the adjudication of the Division's petition seeking pro-

---

1. Rule 126.01(a)(1) provides for a change of judicial officer where the latter is interested, related to a party, or otherwise disqualified.

Father does not claim that this aspect of the rule applies.

tective custody of S.M.H. Thus, if the setting of the date for trial of the petition to terminate Father's parental rights is the relevant trial date under Rule 126.01, then the application was timely; if the relevant trial date is the date that the initial trial of the adjudication of the petition for custody was set, however, then the application was filed long after the time permitted and was properly denied.

Father argues that a petition to terminate parental rights is an independent cause of action; thus, the time to file for a change of judge should begin to run anew, as if an entirely new case had been filed. In support, he cites *State ex rel. Brault v. Kyser*, 562 S.W.2d 172 (Mo.App. W.D. 1978), which held that a proceeding to terminate parental rights is an *independent civil action* for purposes of a change of judge application.

*Brault* does state that a petition to terminate parental rights was treated as an independent civil action under chapter 211 at that time, and that a parent had a new opportunity to seek a change of judge in a termination action. But, this was based on chapter 211 as then constituted, not on Rule 126.01. The current Rule 126.01 was adopted after *Brault*. *Brault* did not address whether Father is entitled to a change of judge under the current rule. Current Rule 126.01(c) does directly address this question. It provides:

> For purposes of this Rule 126.01, *a supplemental petition* and a motion to modify a prior order of disposition under Chapter 211, RSMo, *shall not be deemed to be an independent civil action* unless the judicial officer designated to hear the motion is not the same judicial officer that heard the previous motion.

Rule 126.01(c) (emphasis added). Judge Frawley has been the judge assigned to this case since it was initially filed in 2001. Thus, whether a new period for seeking a change of judge began to run depends on whether the petition to terminate Father's parental rights is encompassed within the term "supplemental petition." If not, then it is treated as an independent civil action and Father's application for change of judge should have been granted; if so, then it is not treated as an independent civil action and the change of judge application was properly denied.

The term "supplemental petition" is not expressly defined in Missouri rules or statutes or in prior case law, and the parties disagree as to its meaning. The Division notes that a proceeding to terminate parental rights is, by its nature, a supplement to the initial petition taking jurisdiction of the child, and follows up on it where necessary to protect the child; therefore, logically, it can be considered a supplemental petition.

■ This Court agrees that use of the term "supplemental" itself indicates that the rule is to apply to proceedings filed as an addition to something previously filed and that is filed by petition. It is indisputable that a petition to terminate parental rights is filed in the same case as, and is given the same case number as, the initial petition requesting the court to take jurisdiction of the child. It is in a true sense a "supplemental" pleading in that initial case. It is, in addition, denominated a "petition." Indeed, a petition to terminate parental rights is the only pleading that either party has identified that is regularly filed in the juvenile proceeding itself, after the initial petition is filed, and which is denominated a "petition" rather than an application or a motion. No doubt for these reasons, while the nomenclature is not universal, juvenile authorities previously have expressly entitled a petition to terminate parental rights as a "supplemental petition". *See, e.g., R.L.L. v. Strait*, 633 S.W.2d 409, 410 (Mo.App. W.D.1982)

("On May 30, 1980, the juvenile officer filed a 'Supplemental Petition for Termination of Parental Rights.'")

There is nothing inconsistent between *Brault's* recognition that proceedings to terminate parental rights are considered independent civil actions for some purposes, and a holding herein that they are not independent civil actions for purposes of applications for change of judge under current Rule 126.01. Indeed, the fact that Rule 126.01(c) sets out an exception to the rule that termination proceedings are independent civil actions acts is an implicit acknowledgment that in other circumstances termination petitions will be so treated. Otherwise, there would have been no need to set out the exception.[2]

■ The decision not to permit a change of judge without cause when a petition to terminate parental rights is filed, or when a motion to modify a prior order of disposition under chapter 211 is filed, is appropriate when considered in the context of Missouri's current approach to juvenile and family matters. In 1993, Missouri modified its previous approach to juvenile matters by adopting a unified family court system.[3] Sec. 487.010 RSMo.[4] *See also* Paul Williams, *Symposium Issue: Children and the Law: A Unified Family Court for Missouri*, 63 UMKC L.Rev. 383, 384 (Spring 1995). The idea behind adoption of a unified family court is to create a single court with comprehensive jurisdiction over all cases involving children and their families. To the extent possible, one judge, specially trained, is to address the

legal and accompanying emotional and social issues challenging each family. *Id.* Under this approach, judicial action, informal court processes, and social service agencies and resources are coordinated to produce a comprehensive solution tailored to the individual family's legal, personal, emotional, and social needs. *Id.* This results in a more efficient one-family/one-judge system that is more compassionate for families in crisis. *Id.*

The current version of Rule 126.01 was amended December 9, 1997, and became effective January 1, 1999. The previous version of the rule did not contain the language at issue. It seems evident that the new language was intended to reflect the policies that resulted in adoption of the unified family court system, by permitting a single judge to retain jurisdiction of a case for purposes of later motions and later petitions, such as petitions to terminate parental rights, absent a showing of cause for disqualification.

For these reasons, this Court holds that a petition to terminate parental rights is a "supplemental petition" as that term is used in Rule 126.01(c). Because Judge Frawley was the same judicial officer who heard previous proceedings in the case, Father's motion for change of judge was not timely and was properly overruled.

## II. CLEAR, COGENT, AND CONVINCING EVIDENCE TO SUPPORT TERMINATION IS LACKING

*A. Burden of Proof and Standard of Review.*

**2.** Rule 126.01(c) similarly provides that a motion to modify an order of disposition of a child will not be considered an independent civil action if tried before the same judicial officer that heard prior proceedings involving the child, even though in the circumstance of a dissolution action, for example, a motion to modify is considered an independent civil action. *See, e.g., Castor v. State,* 20 S.W.3d 603, 605 (Mo.App. S.D.2000).

**3.** Although referred to as "family court", these proceedings occur in a division of the circuit court.

**4.** All statutory citations are to RSMo 2000, unless otherwise indicated.

A trial court can terminate parental rights only if the grounds for termination are supported by clear, cogent, and convincing evidence. *In the Interest of M.D.R.*, 124 S.W.3d 469, 476 (Mo. banc 2004). Clear, cogent, and convincing evidence is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true. *In the Interest of A.S.W.*, 137 S.W.3d 448, 454 (Mo. banc 2004). The presence of evidence to support one statutory ground for termination is sufficient to terminate a parent's rights. *M.D.R.*, 124 S.W.3d at 476.

This Court will affirm the trial court's decision to terminate parental rights unless the "record contains no substantial evidence to support the decision, the decision is against the weight of the evidence, or the trial court erroneously declares or applies the law." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). *See also A.S.W,* 137 S.W.3d at 452. As a practical matter, this means the judgment will be reversed "only if we are left with the firm belief that the order was wrong." *In the Interest of T.G.*, 965 S.W.2d 326, 332 (Mo.App. W.D.1998). Of utmost concern in parental rights cases is the best interests of the children. *In the Interest of J.K. and R.T.H.*, 38 S.W.3d 495, 499 (Mo. App.W.D.2001). Conflicting evidence will be reviewed in the light most favorable to the judgment of the trial court. *A.S.W.*, 137 S.W.3d at 452.

However, because parental rights are a fundamental liberty interest, statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship. *Id.* at 454. "The termination of parental rights is the exercise of an awesome power, and should not be done lightly." *In the Interest of P.D.*, 144 S.W.3d 907, 910 (Mo.App. E.D.2004). The decision to terminate such rights, therefore, will be reviewed closely. *Id.; see also In the Interest of J.M.N.*, 134 S.W.3d 58, 65 (Mo.App. W.D.2004).

### B. Factual and Procedural Background.

S.M.F. ("Mother") moved in with T.H., Jr., who was 35 years old, when she was 15 years old, and they began a sexual relationship when she was 16 years old. She became pregnant and gave birth to a daughter, S.M.H., on October 6, 2001, at age 17. On April 27, 2002, the Division filed a petition under section 211.031 RSMo, alleging that S.M.H. was without the proper care, custody, and support because Mother had a mental illness, was suicidal, and had threatened to kill her daughter. The petition further alleged that Father did not take Mother's threats against S.M.H. seriously and that she was in need of proper care.

The Division took protective custody of S.M.H., and she was placed in foster care. On June 17, 2002, after trial, the court took jurisdiction of S.M.H. She was placed in the Division's temporary legal and physical custody, but the court determined that Father was an appropriate placement for the child and she was placed with him. Mrs. Dean began providing childcare for S.M.H. Because Father's work schedule caused him to pick up S.M.H. late at night and return her early in the morning, he placed her in the care of Mrs. Dean and her husband the next month. Father would regularly visit S.M.H. at the Deans.

The court held a review hearing on October 22, 2002. It entered an order directing that S.M.H. remain in the Division's custody for appropriate placement, "which may or may not be the Father, which is to be determined by the Family Support

Team." The Division initially placed S.M.H. in foster care, but by consent of all parties, in December 2002 an order was entered placing S.M.H. back in Father's custody "so long as he resides with the Deans." Father and S.M.H. moved into the Dean residence, although Father also spent time at the home of a friend.

Another review hearing was held on February 6, 2003. The Division filed a permanent plan summary, which found progress on compliance with the social service plan and recommended that the child return to the legal custody of Father and Mother. On February 13, 2003, after conducting a permanency plan hearing retaining jurisdiction and ordering the Division to continue its reunification efforts, the court entered a permanency review order, which directed the Division to make a recommendation on permanent placement of S.M.H.

On June 5, 2003, a family support team meeting was held, and the Division prepared a new permanency plan. That plan indicated that Father and Mother had successfully negotiated the steps necessary to retake full custody of their child. It stated that Father and Mother had *fully* completed the terms of their social service plans. It recommended that full legal and physical custody of S.M.H. be returned to Father and legal custody to Mother, that the Division terminate protective custody, and that the court terminate jurisdiction over the child.

A hearing was scheduled on the plan for June 25, 2003, at which it was anticipated that Father would regain full custody of S.M.H. However, in the week after the Division's recommendation, the Deans let Father know that they wanted to keep S.M.H. with them but wanted him to come to the house only on a schedule worked out with them in advance, rather than just having him "popping" in and out. He told them that if they kept his daughter, then he wanted to be able to come and go to see her, and in fact the then-governing court order specifically provided that he was S.M.H.'s custodian, not the Deans, making his objection to being told that the Deans wanted to limit him to scheduled visits with S.M.H. understandable.

Unwilling to accept being put on a schedule, Father told the Deans that he and his daughter were a "package deal" and, as they would not take the package, he moved his daughter out of their residence and brought her to Mother's house to live. Nonetheless, recognizing that the Deans and his daughter were close, he permitted S.M.H. to visit with the Deans thereafter.

Father moved S.M.H. without informing the Division of the Deans' insistence that he only come to the house on a schedule to see S.M.H. and without seeking permission to move with her to a new location. Father later explained that, because at the June 5, 2003, family support team meeting Mother was classified as an appropriate placement and permitted unsupervised daytime visitation, he thought it would be all right for him to bring S.M.H. back to live with Mother so she could help him care for their daughter. He also admitted that he knew the standing order officially still provided otherwise, however.

The Division did not learn of Father and S.M.H.'s move to Mother's residence until Michelle Dean told caseworkers about it after S.M.H. had been living with Mother for about two weeks. The Division then learned that Mother allowed S.M.H. to visit the Deans for a weekend in June while Mother went on a float trip, and that, when Mother came to pick up the child, she decided to leave her in the Deans' care temporarily.

Nothing in this record indicates that Mother threatened S.M.H. or put her in any danger during this period, nor does any evidence indicate that Mother engaged in other conduct showing she was not an appropriate custodian for her daughter. But, because the standing court order did not authorize Mother to have overnight visits, at the June 25, 2003, hearing the court placed S.M.H. in the custody of the Deans and permitted Father only limited visits each week, until a further hearing could be held on August 11, 2003 and ordered the Division to file a petition in the probate division seeking guardianship by the Deans within thirty days from that order.[5]

No new report was prepared by the August 11 hearing; the last one prepared was the report of June 5, 2003, recommending termination of court jurisdiction and returning custody to Mother and Father. Nonetheless, although no other events relevant to disposition occurred between June 25 and the August 11, 2003, hearing, the Division withdrew its recommendation of permanent placement with Father and Mother and release of the court's jurisdiction over S.M.H. At the August 11 hearing the court directed the Division to file a petition to terminate parental rights, finding that the permanent plan that would best serve S.M.H.'s interests was termination.

As directed by the court, the Division filed a petition to terminate parental rights pursuant to section 211.447, on September 8, 2003, under the same case number. The petition alleged as to *Mother* that she had failed to support the child, that she had a mental condition—depression—that rendered her unable to provide for her child's care, custody, and control, and that she was unfit to be a party to the parent-child

relationship, and that the conditions that led to assumption of jurisdiction still remained. It then listed seven ways in which Mother allegedly had failed to make progress on social service plans, failed to secure housing, provide financial support, and so forth. Mother is separately appealing the judgment against her on the grounds asserted. As relevant here, the petition alleged three grounds for termination of *Father's* parental rights:

- that S.M.H. had been in foster care for at least 15 of the previous 22 months;

- that S.M.H. had been abused and/or neglected as indicated when initial jurisdiction over her was adjudicated in June 2002, and "there has been a repeated and/or continuous failure by [Father] although physically or financially able, to provide the said child with adequate food, clothing, shelter, or other care and control necessary for the said child's physical, mental or emotional health and development;"

- Finally, although apparently merely cut and pasted from the allegations as to Mother, and therefore referring to Father as "she," and "her," and containing allegations of failure to maintain consistent visitation and abuse of alcohol and drugs that the Division admits had absolutely no application to Father or support in the record, the petition alleged a failure by Father to rectify the conditions that led to taking jurisdiction, stating that the conditions that led to the assumption of jurisdiction "still persist and/or conditions of a potentially harmful nature continue to exist in that ... [Father] "has

**5.** The guardianship petition was subsequently never filed because Father refused to consent and the Deans did not want to go through a contested guardianship hearing.

failed to make sufficient progress toward adjusting *her* circumstances so as to allow the child to be returned to *her* custody;" and similarly elsewhere alleged that Father failed otherwise to comply with service agreements or secure and maintain housing, that he failed to attend "her" psychiatric appointments or follow through on counseling, and failed to show commitment toward having the child returned to "her" custody.

The court found all three pleaded statutory grounds to be supported by clear, cogent, and convincing evidence. The court also found an additional ground for termination as to Father, that he was unfit to be a parent under section 211.447.4(6), although this ground had been asserted in the petition only as to Mother. Father appealed to the Court of Appeals, Eastern District, which transferred the case to this Court pursuant to Rule 83.02. This Court finds that the evidence did not support the decision to terminate Father's parental rights under section 211.447 on the three pleaded grounds and that it was improper for the court to address additional bases for termination not pleaded.

*C. Termination May Not be Based on Foster Care for 15 of 22 Months.*

 The first reason given by the court for termination of Father's parental rights was that S.M.H. "was detained in the custody of the Division of Family Services on or about April 27, 1998, and therefore on the date of the evidentiary hearing, the minor child has been in foster care for at least 15 of the most recent 22 months." This was, on its face, incorrect. S.M.H. was not even born until October 6, 2001. Whether the judge would have found that S.M.H. could be considered "in the custody of the Division" for the required 15 month period, had the correct dates been used, is

unclear. While the Division took protective custody of S.M.H. in April 2002 and the termination petition was filed 17 months later, in September 2003, S.M.H. had been placed in Father's custody for the vast majority of that period; she was in foster care for a total of less than six months.

In any event, this Court recently held in *M.D.R.*, 124 S.W.3d at 469, that presence of a child in foster care for 15 out of the most recent 22 months authorizes the filing of a petition to terminate parental rights, but cannot itself provide a separate ground for termination. Therefore, to the extent that the court ordered termination on this ground, its judgment was in error.

*D. Termination under Section 211.447.4(6) Was Improper Because Not Pleaded in the Petition.*

 The court also held that Father was unfit to be a party to the parent and child relationship and terminated his parental rights under section 211.447.4(6). In support, the court cited the fact that Father moved his daughter out of the Dean home without court permission or notice and did not understand why he should not have custody of her.

For reasons discussed below, Father's move of his daughter was not a sufficient basis to take his child from him. An even more basic concern, however, is the fact that the Division did not seek termination on the basis that his conduct made him an unfit parent. The petition alleged only that Mother was unfit.

The trial court erred in terminating Father's parental rights on a basis not pleaded in the petition. This issue was addressed on very similar facts in *In the Interest of J.M.S.*, 83 S.W.3d 76, 86 (Mo. App. W.D.2002). It held the trial judge committed reversible error in terminating a father's parental rights for abuse and

neglect because the petition had only alleged this as a ground to terminate *mother's* parental rights, not father's. As a result, "the petition did not fairly advise Father that he would be required to defend against allegations that he had abused and neglected J.M.S." *Id.* at 87.

The reason why such notice is necessary was explained in *In the Interest of H.R.R.*, 945 S.W.2d 85 (Mo.App. W.D.1997), as follows:

> Due process requires that [t]he petition in a termination of parental rights case should contain allegations likely to inform those persons involved of the charges, to the end that objection may be prepared.

*Id.* at 88 (internal quotations omitted). *H.R.R.* reversed a termination on the grounds of failure to rectify where the petition had pleaded only abandonment. *Id.*

An exception exists to the rule that parental rights cannot be terminated on grounds not contained in the petition, where the additional grounds are tried by consent. But, that rule applies only where the evidence bears solely on an unpleaded issue and is admitted without objection. *Id.* at 86. That did not occur here. The evidence the court cited was all admitted on other issues. It was error to terminate Father's parental rights under section 211.447.4(6).

*E. Neglect of S.M.H. by Failing to Provide Care, Custody, or Support.*

The trial court also found that the evidence supported the allegation in the petition that termination was proper under section 211.447.4(2) because "there has been a repeated and/or continuous failure by [Father] although physically or financially able, to provide the said child with adequate food, clothing, shelter, or other care and control necessary for the said

child's physical, mental or emotional health and development."

In determining whether to terminate parental rights based on abuse or neglect the court considers four factors. Sec. 211.447.4(2). These factors include whether the parent has: (a) a mental condition that renders the parent unable to care for the child that is unlikely to improve in the future; (b) a chemical dependency of similar nature; (c) whether the parent engaged in severe or recurrent acts of physical, emotional or sexual abuse towards the child or any child in the family; or (d) whether there was a repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education. *Id.*

The petition alleged that Father neglected the child under (d), stating that "Father had repeatedly and continuously failed, though physically or financially able to do so," to contribute to the costs of care and maintenance for the child. The record does not support this basis for termination.

In finding a failure to support, the court cited only the testimony of Michelle Dean, who currently had custody of the child and is seeking to adopt her, that in the three months between when she indicated that she wanted to adopt S.M.H. in the fall of 2003 and the court hearing in December 2003, Father had contributed only approximately $500 for support of S.M.H. and this was insufficient to pay Mrs. Dean's child care and other costs during that period. This testimony was insufficient to provide a basis for termination under the statute.

The Division's argument in this Court seems to assume that, in order to avoid termination under section 211.447.4(2)(d), a parent must provide the full amount that would be necessary to support a child had a child support order been entered. The

issue here is not a failure to pay court-ordered child support, however. Indeed, Father was only under a child support order for a two-month period in late 2002. Thereafter, he regained physical custody of S.M.H. and his support obligation was terminated.

▮ Rather, the issue under 211.447.4(2)(d) is whether the parent has fulfilled his affirmative duty to support, communicate with, and visit the child. *In the Interest of A.S.*, 38 S.W.3d 478, 484 (Mo.App. S.D.2001). The financial support of a child is a continuing obligation. *In the Interest of Q.M.B. and Q.T.P*, 85 S.W.3d 654, 660 (Mo.App. W.D.2002). If a parent is unable to pay for all of a child's financial needs, he or she has a duty to provide as much as he or she reasonably can. *Id.* Evidence that a parent has provided some contribution, even if not fully sufficient for support, demonstrates the parent's intent to continue the parent-child relationship and militates against termination. *In the Interest of J.M.L.*, 917 S.W.2d 193, 196 (Mo.App. W.D.1996).

▮ Further, termination of parental rights is not permitted to be based on only occasional lack of support. It must be based on a "repeated or continuous failure ... although physically or financially able, to provide the child with adequate food, clothing, shelter or education as provided by law." Sec. 211.447.4(2)(d). Here, in addition to providing some $500 during the three months before the final hearing, Mrs. Dean testified that when S.M.H. began living with her in July 2002, Father paid all her daycare expenses and would bring home diapers from Schnuck's, along with apple juice, cookies, and other items. She also testified that since June 2003

Father had provided her with checks totaling $900.00, a $200.00 gift card for Schnuck's, and had bought diapers and shoes for S.M.H.[6] In response to a question as to what items at the Deans' home were purchased by Father, Mrs. Dean stated Father bought a bouncer, a slide, an activity center, a stroller, three or four toys, and a baby ring. Furthermore, at the termination hearing in December 2003, Mrs. Dean testified that Father currently carried health insurance on S.M.H. and that she has an insurance card for S.M.H. that she could use, but that she chooses not to use it because the "co-pay was outrageous." Instead, Mrs. Dean testified that she voluntarily pays for S.M.H. to receive healthcare outside of the insurance that is provided for by Father. She also voluntarily chose to send her to a day care that cost $125 per week. While this was commendable, failure to pay for such care does not mean that Father failed to support his daughter on a repeated or continuing basis, as required by the statute.

Finally, there was substantial evidence that, while Father's gross income from his landscaping work was over $40,000 per year, his expenses reduced his net income from that employment to around $10,000, and his total income for that year was about $27,000. Indeed, the Division cited the lack of a greater income as a reason for concern as to whether Father could adequately support S.M.H. with his preferred type of employment. The record also shows that the Division wanted Father to find a more appropriate housing situation for his daughter to live in, which he did, during the period in which the court found a lack of support, by buying a house for S.M.H. to move into with him if he regained custody. No showing was

---

**6.** Father has apparently stopped paying the childcare expenses since moving out of the

Dean residence.

made that he had additional funds after finding such housing that he should have used for his daughter's further support, nor does it show what other unreimbursed costs Mrs. Dean incurred in providing *necessary* care for S.M.H. The record does not support a claim of failure to provide financial support so great as to provide a basis for termination under section 211.447.4.2(d).[7]

*F. Conditions that Led to Removal Still Exist.*

▮ The court also ordered termination because it agreed with the final ground for termination alleged in the petition, that Father failed to rectify the conditions that led to assumption of jurisdiction of S.M.H. In determining whether to terminate parental rights based on failure to rectify, section 211.447.4(3) requires the court to consider four factors: (a) the terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with the terms; (b) the success or failure of the efforts of the juvenile officer, the division, or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child; (c) the presence of a "mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control"; and (d) the presence of a chemical dependency. *Id.*

The petition sought to terminate Father's parental rights only for violation of (a) and (b), alleging that Father had failed to comply with the service agreement in various particulars and that he had failed to provide a stable home. The petition did not allege that Father had a chemical dependency or a mental condition that rendered him unable to care for his child.

The court found the Division had proved the allegations of the petition that Father had made insufficient progress toward satisfaction of his obligations under the social service plan incorporated in the court's orders and that the Division had been unsuccessful in its efforts to assist Father in adjusting his circumstances and conditions to be able to provide a proper home for the child on a continuing basis. The record before the court supported neither finding.

▮ Whether it has been created by court order or by the Division, a social services treatment plan can provide a trial court with highly relevant evidence. *In the Interest of K.A.W.,* 133 S.W.3d 1, 17 (Mo. banc 2004). The extent of the parent's effort in meeting the goals established by the plan will provide the court with an indication of the parent's efforts in the future to care for the child. *Id.* A lack of effort on the parent's part to comply with the plan, or effort but no success, can help predict future problems. *Id.*

▮ But, a parent is not required to completely satisfy all aspects of a plan in order to avoid termination, so that a parent's failure to comply with one or more parts of a social service treatment plan does not, by itself, constitute a ground

**7.** The trial court did not find that Father failed to provide S.M.H. with "other care, and control" necessary for her physical, mental or emotional health and development. The court cited only Ms. Dean's testimony about lack of financial support. Further, the record is clear that Father communicated with and visited the child regularly and was her custodian during much of the period at issue. At all other times, Father attended every visitation he was allowed and spent the entire time allotted to him.

for terminating a parent's rights; rather it is merely a factor to consider under section 211.447.4(3). *In the Interest of C.N.G.,* 109 S.W.3d 702, 707 (Mo.App. W.D.2003). The issue is whether progress has been made in complying with the service agreements, not whether there has been full or substantial compliance. *Id.*

While the court held that Father had made little or no progress in complying with the social service plan, the uncontradicted record reveals otherwise. Numerous goals initially had been set for Father, and at various assessments over the coming year, the Division determined that Father was progressing toward fulfillment of the terms of the service plans. In February 2003, the Division's permanent plan summary stated that he had complied with all services offered, including maintaining housing and employment, completing individual therapy, parenting skills training and family violence counseling, and undergoing a psychological evaluation and psychosexual evaluation. It concluded that, "[the division] recommends that the child return to the legal custody of father." Again, the court found that Father was an appropriate placement, that he had substantially complied with the court-ordered service plan, and that he had made partial progress towards eliminating the conditions that prevented S.M.H. from returning home.

In the next permanent plan summary, prepared June 5, 2003, the Division was even more satisfied with Father's and Mother's progress. The plan concluded that the Division found that Father had *fully* complied with the plan and recommended that physical and legal custody be returned to Father and legal custody to Mother and that the court terminate jurisdiction entirely. That was recommended to occur at the June 25, 2003, hearing, just three weeks later.

The caseworker later admitted at the termination hearing that the only event that occurred between that recommendation and the Division and court's decision to instead seek termination was Father's choice to remove S.M.H. from the Dean home without permission or notice to the Division. She further testified that even though nothing in the plan required Father to continue living at the Deans' residence after custody was returned to him and even though the plan found Mother and Father to be sufficiently safe and appropriate placements for S.M.H. that the Division was recommending that the court's jurisdiction be terminated at the June 25, 2003, hearing, once Father moved out of the Deans' house, her opinion changed entirely because she had privately assumed that he would remain with the Deans and because she was disturbed that he would disobey the court order to remain there.

While Father erred in moving S.M.H. from the Deans without court permission, he also would have violated the then-governing court order to let her live with the Deans and only visit her on a schedule, as Mrs. Dean requested that he do. The order had appointed Father, not the Deans, as S.M.H.'s custodian and had directed that he have custody so long as he live with the Deans; it did not authorize the Deans to keep S.M.H. in their custody if they denied him the right to live in their home. Further, Father explained that because he had been told that he and Mother would be getting back custody of S.M.H. in a few weeks, after the June hearing, he thought he could let S.M.H. stay with Mother sooner. While incorrect, this misunderstanding does not show a lack of concern for S.M.H. or a desire to expose her to danger. Nothing in the Division's recommendation made on June 5, 2003, conditioned termination of jurisdiction and

return of custody to Father on his continued living with the Deans or indicated to him the dire consequences of moving out with his daughter should the Deans tell him he could not live with them—that reunification would subsequently be denied.

The Division notes that, at the termination hearing, the caseworker testified that Father had failed to show her a lease for his old apartment and that she had not visited the new home he bought and his old apartment had insufficient furniture. But, she later admitted that she had never asked for a copy of the lease or told him he should give it to her, that she had never asked for copies of prior leases, that she failed to return his calls when he tried to get her to evaluate his new home because she was just too busy, and that S.M.H.'s toys and some furniture were at the Deans and if the baby came to live with him, he would have some of those items in his home for her. The caseworker also admitted that, while she said he had not provided her with proof of income before a particular hearing, she had never asked him for such proof or told him he needed to give it to her, and in fact proof of his income was placed in the record before the court ruled on the petition to terminate. She also stated that until June 2003, she had thought he had adequately provided her with information on support and employment, although the type of information he provided her thereafter was not different from that which he had provided her previously.

The record does not support a finding that Father failed to substantially comply with the service plan or to adjust his circumstances and provide a proper home. Rather, it shows substantial compliance, a home and a steady job, and a lack of knowledge of the Division as to the adequacy of the home because of a failure to investigate.

The caseworker was quite frank that the real reason that she changed her recommendation was that she did not think that Father could raise S.M.H. alone and that he has always told her that he does not intend to and cannot raise S.M.H. alone. This did not bother her while he was living at the Deans but once he moved out she thought his rights should be terminated.

Not only was this requirement of living with the Deans not in the June 5 permanency plan, but it does not provide a basis for termination. The issue is whether Father can provide proper care for his child, not whether he is living with a particular couple chosen by the caseworker *sub silencio.*

Further, as this Court recently recognized in *A.S.W.,* 137 S.W.3d at 453, decided after the court entered judgment in this case, nothing in section 211.447 requires a parent to show that he or she can raise a child by himself in order to avoid a termination of parental rights. To the contrary, children are frequently raised with help from others such as grandparents, siblings, aunts and uncles, neighbors, daycare, and babysitters. *A.S.W.* held that the fact that the father's mental condition made him unable to care for his child alone did not support termination of his parental rights where he had arranged assistance in caring for his son. *Id.*

So too, here, by the time of the hearing, it appears that the Deans and Father had worked out their differences, and that the Deans were willing to continue caring for S.M.H. and Father intended to seek their help. He also said that he recognized his need for assistance in raising his daughter and would obtain assistance in caring for her from another couple if the Deans could not assist him. Under *A.S.W.,* the fact that he needed assistance in providing for his

daughter did not provide a basis for termination.

### G. Finding of a Mental Condition as Support for Termination.

■ The court also found that termination for abuse and neglect and failure to rectify was supported by Father's mental condition that is permanent and has no reasonable probability of reversal. The court found this supported termination under section 211.447.4(2)(a) for neglect and under section 211.447.4(3)(c) because it is a condition of a harmful nature that still persists and is unlikely to be rectified soon.

This Court notes that neither the initial petition taking custody of S.M.H. nor the petition to terminate *Father's* parental rights alleged that he had a mental condition that served as the basis for neglect or failure to rectify. The petition did make such allegations as to *Mother*, but as to Father alleged only a failure of support and failure to comply with the service plan and to adjust his circumstances to provide for S.M.H., as addressed earlier. A serious question exists whether it would be proper to terminate Father's rights where the petition did not make this assertion as to Father. *Cf., J.M.S.,* 83 S.W.3d at 86–87; *H.R.R.,* 945 S.W.2d at 88.

But, this Court need not resolve this issue. Even were it appropriately considered as a basis for termination, the record fails to support the court's finding that Father had a mental condition of such a type as to support termination of his parental rights.

■ A parent's mental state cannot constitute a basis for termination for abuse or neglect unless it rises to the level described by section 211.447.4(2)(a): "a mental condition which is shown by competent evidence either to be *permanent or such that there is no reasonable likelihood that*

*the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control.*" (emphasis added). This provision requires a showing of more than merely the presence of mental or emotional instability or problems; the incapacity must be so severe that it renders the parent incapable of providing minimally acceptable care and the condition cannot be reversed or improved in a reasonable time. *See K.A.W.,* 133 S.W.3d at 26, *citing* Mark Hardin and Robert Lancour, *Early Termination of Parental Rights: Developing Appropriate Statutory Grounds,* 14 (1996).

The expert reports relied on by the court to terminate Father's parental rights based on a mental condition did not meet this standard. The report by Dr. Daus was prepared in June 2002 and provided the basis for taking jurisdiction of S.M.H. As *K.A.W.* specifically held, however, "abuse or neglect sufficient to support termination under section 211.447.4(2) [must] be based on conduct at the time of termination, not just at the time jurisdiction was initially taken." *K.A.W.,* 133 S.W.3d at 16.

The second expert, Dr. Emmenegger, similarly examined Father just before and just after the court took jurisdiction of S.M.H. While she and Dr. Daus did express concern that Father had "impaired judgment, lack of insight, and immaturity" and displayed a "personality disturbance that typically presents in anti-social attitudes" and feelings of self-importance, and this would affect his parenting ability, they did not find he had any insurmountable mental disease or defect. It was proper for the court to consider this testimony in ultimately deciding whether to terminate, but neither expert provided a basis for the court's holding that Father could not improve or that his mental condition ren-

dered him permanently, nor even temporarily, unfit to parent his child.[8]

In fact, for most of the year following these doctors' reports, the court and the Division agreed that S.M.H. could appropriately be placed in her father's care, and she was placed with him. At the end of that period, far from concluding that Father's parental rights should be terminated, the Division recommended termination of the *court's* jurisdiction and termination of its own protective custody. As is evident, even in the eyes of the Division, the reports of Drs. Emmenegger and Daus did not provide the basis for the required finding that the mental condition at issue was permanent and could not reasonably be expected to be reversed and rendered the parent unable to knowingly provide necessary care to his daughter.

The only major concern raised by Dr. Emmenegger as to Father's future behavior, that might make him an inappropriate guardian for his daughter, was whether the fact Father had a sexual relationship with Mother when she was only 16 meant he presented a risk of sexual abuse of his daughter. Dr. Emmenegger did not say he would be such a risk, but rather that an expert in the sexual offender field should examine him to explore this issue.

Two experts did examine Father for this purpose. Both found that he would not present any sexual risk to his daughter and he was not a pedophile, he merely had a sexual relationship with a much younger woman. Drs. Daus and Emmenegger did not identify any other basis on which Father's rights could properly be terminated. Neither did the experts who examined Father, at Dr. Daus and Emmenegger's suggestions, in the year after the court took jurisdiction of S.M.H. They found that he

exhibited clinical symptoms of narcissism, but did not suggest that this manifested itself in any danger to S.M.H., but in Father's being unduly self-oriented. While this might impede Father's ability to care for S.M.H. should he try to do so totally on his own, he recognized his own limitations and testified that he would rely on others to help him provide S.M.H.'s support. As noted, the caseworker testified this was insufficient, and recommended termination in large part because she thought the character traits that caused his inability to take care of S.M.H. without assistance made him an inadequate parent.

But, as previously discussed, the fact that a parent's mental condition renders him unable to raise a child alone does not provide a basis for termination. *A.S.W.*, 137 S.W.3d at 453. The law does not require parents to be perfect or be model parents. Poor conduct or character flaws are not relevant unless they could actually result in future harm to the child. *K.A.W.*, 133 S.W.3d at 11. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The evidence shows that, although Father may not be a model parent and has in the past made some bad choices and exhibited some poor behaviors, he will be able to knowingly provide S.M.H. the necessary care, custody, and control. This is all that is required.

## V. CONCLUSION

For the above reasons, there was insufficient evidence to support termination of

---

**8.** Similarly, testimony from Father's own parent as to Father's mental difficulties when Father was 20 do not provide a basis for finding that Father had not improved and could not adequately parent S.M.H. over 15 years later, at the time of the hearing.

Father's parental rights.[9] The judgment is reversed, and the case is remanded.

PRICE, LIMBAUGH and RUSSELL, JJ., concur.

TEITELMAN, J., concurs in part and dissents in part in separate opinion filed.

WHITE, C.J., and WOLFF, J., concur in opinion of TEITELMAN, J.

RICHARD B. TEITELMAN, Judge, concurring in part and dissenting in part.

I concur with that part of the principal opinion holding there was insufficient evidence to terminate parental rights in this case. However, I dissent from the holding that a petition to terminate parental rights is a "supplemental petition" for purposes of Rule 126.01(c). This unnecessarily limits the traditional right of litigants to disqualify the judge and severely disadvantages parents faced with proceedings designed to forever extinguish the parent-child relationship. In addition, characterizing petitions to terminate parental rights as a supplement to an earlier petition to assume jurisdiction over a child in need of care and treatment ignores the fundamentally different purposes and factual predicates underlying the two petitions.

"(N)o system of justice can function at its best or maintain broad public confidence if a litigant can be compelled to submit his case in a court where the litigant sincerely believes the judge is incompetent or prejudiced ... (T)hat is the price to be paid for a judicial system that seeks to free a litigant from a feeling of oppression." *State ex rel. McNary v. Jones,* 472 S.W.2d 637, 639–640 (Mo.App.1971). Missouri courts have, therefore, traditionally liberally construed statutes and rules in favor of the right to disqualify. *State ex rel. Wesolich v. Goeke,* 794 S.W.2d 692, 695

(Mo.App.1990); see also, *State ex rel. Horton v. House,* 646 S.W.2d 91, 93 (Mo. banc 1983); *In the Matter of the Estate of Boeving,* 388 S.W.2d 40, 50(9) (Mo.App.1965). Although the case law requires that this precedent inform the interpretation of Rule 126.01(c), the principal opinion neither cites nor applies this law in its analysis. Instead, the principal opinion's holding is premised upon at least three general conclusions, none of which withstand analysis.

I. *State ex rel. Brault v. Kyser*

The principal opinion concludes that *State ex rel. Brault v. Kyser,* 562 S.W.2d 172 (Mo.App.1978), is inapplicable, even though *Brault* expressly held that a petition to terminate parental rights is an independent civil action entitling a party to a new motion for change of judge. The reasoning in *Brault* is sound today, just as it was then.

The *Brault* court first noted that petitions for protective custody and petitions for termination of parental rights are grouped together in separate subheadings within chapter 211. *Id.* at 174. That is still the case. Petitions to assume jurisdiction over children in need of care and treatment are covered by sections 211.031 to 211.431. The provisions pertaining to the termination of parental rights are grouped together in sections 211.442 to 211.490 and are specially marked off with the subheading "Termination of Parental Rights. Although not dispositive, the retention of a separate subheading indicates the intent to classify petitions to terminate parental rights as independent actions." See, *Smith v. Doe,* 538 U.S. 84, 94, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003)(noting that a separate subheading within the criminal code containing the statutory provisions

9. As the judgment is reversed, this Court does not reach the other issues raised.

for sex offender registration evidences some intent to classify the registration requirements as a criminal punishment).

Second, *Brault* noted that protective custody petitions have a fundamentally different purpose than a petition to terminate parental rights. *Id.*, at 174. The petition to assume jurisdiction contemplates only a temporary change of custody and leaves parental rights intact, whereas the petition to terminate parental rights seeks to nullify the parent-child relationship. *Id.* The petition to terminate parental rights represents a fundamental shift in the state's role from assisting a family in distress to dismantling the very existence of that family. Parents have a fundamental liberty interest in the care, custody and nurturance of his or her child, *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). A petition to terminate those fundamental interests is not merely supplemental.

Finally, *Brault* noted that because the petition to terminate parental rights seeks a different result than the petition for juvenile division jurisdiction, it also requires different factual findings. *Brault*, 562 S.W.2d at 174. The principal opinion dismisses *Brault* because the decision is based upon "chapter 211 as then constituted," but does not recognize that the fundamental differences between petitions for juvenile division jurisdiction and petitions to terminate parental rights remain unchanged. As *Brault* explained, a petition for termination of parental rights was, and still is, an independent civil action.

Rule 126.01 is not inconsistent with *Brault*. Rule 126.01 does not mention petitions to terminate parental rights. Instead, the rule provides only that:

"a supplemental petition and a motion to modify a prior order of disposition under chapter 211, RSMo, shall not be deemed to be an independent civil action unless

the judicial officer designated to hear the motion is not the same judicial officer that heard the previous action."

Absent an express provision in Rule 126.01(c) that a petition to terminate parental rights is a supplemental petition, and in view of the continued applicability of the reasoning in *Brault*, it begs the question to conclude that the term "supplemental petition" must refer to petitions to terminate parental rights. Imposing such a significant limitation on the long-standing and vital right to disqualify a judge requires more than an inference.

II. *Defining "supplemental petition"*

The principal opinion notes that the term "supplemental petition" is not expressly defined in Missouri law. However, section 509.510, entitled "Supplemental Pleadings," provides in part that:

Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to supplemented.

A petition is a pleading. Therefore, a "supplemental petition" is a "supplemental pleading" within the plain meaning of section 509.510.

Analyzed in light of section 509.510, a petition to terminate parental rights is not merely a supplemental pleading or petition. Unlike a supplemental petition, a petition to terminate parental rights is not filed upon the motion of a party. It is filed either on the state's own initiative or, in some instances, by statutory mandate. See, e.g., section 211.447.2. Unlike a supplemental petition, a petition to terminate parental rights does not simply set forth transactions and occurrences that have happened since the date of a protective custody petition. Instead, as the *Brault*

court held, it is an independent civil action seeking a fundamentally different result supported by a different set of required factual findings. A supplemental petition is nothing more than a mechanism to add a necessary party or clarify an allegation.[1] Thus, the "supplemental petition" referenced in Rule 126.01(c) refers only to a supplemental juvenile division petition seeking, for example, a change in an order of disposition entered by the juvenile division.

The statutorily mandated procedures for commencing an action to terminate parental rights further support the conclusion that such actions are independent. Section 211.452 requires the petition to terminate parental rights to be filed in the juvenile division that has prior jurisdiction over the child. Section 211.453 provides that service of the summons on the petition shall be made as in other civil cases in the manner prescribed in section 506.150, RSMo. Chapter 506 governs the Commencement of Actions, with section 506.150 specifically setting forth the manner in which service of process must be made in civil cases. If petitions to terminate parental rights were nothing more than a supplemental petition, there would be no need to serve process in compliance with section 506.150 governing the commencement of civil actions.

In lieu of the aforementioned statutes, the principal opinion relies upon the fact that petitions to terminate parental rights are sometimes given the "same case number as the initial petition requesting the juvenile court to take jurisdiction." The administrative expediency of assigning case numbers is irrelevant.[2] The relevant factors—the aforementioned statutes, the fundamental nature of the rights and interests involved in these cases, the different purposes and required findings and the actual impacts on families—lead to the conclusion that petitions to terminate parental rights are independent civil actions.

### III. One Family/One Judge

Finally, the principal opinion concludes that limiting the right to disqualify the judge in proceedings to terminate parental rights is consistent with the "one family/one judge" system supposedly implemented when Missouri adopted the family court system established in chapter 487. However, nothing in the actual language or structure of chapter 487 adopts a one family-one judge system. There are no provisions in chapter 487 mandating that one judge adjudicate all petitions filed after the court assumes jurisdiction. Chapter 487 does nothing more than establish family court divisions in some judicial circuits, define the jurisdiction of those divisions, set the qualifications for family court division judges and commissioners, and establish the general administrative structure for the family court division.

---

1. There are other statutes that employ the term "supplemental petition" and support the conclusion that a supplemental petition is simply an amended petition. For example, section 507.030.2 provides that when persons have a joint interest in a cause of action and a "complete determination of the controversy cannot be had without the presence of other parties," the court "may order them to be brought in by an amendment of the petition, or by a supplemental petition and a new summons." Similarly, section 473.340.4 provides that in a suit to assert an interest in the assets of an estate, an "amended or supplemental petition" may be filed if "the court finds that a complete determination of the issues cannot be had without the presence of other parties...."

2. Likewise, the fact that juvenile officers occasionally denominate petitions to terminate parental rights as supplemental petitions has no bearing on the legal analysis.

Given the lack of statutory support for the one family/one judge concept, the principal opinion turns to a student comment published in the University of Missouri–Kansas City Law Review. See, Paul Williams, *Symposium Issue: Children and the Law: A Unified Family Court for Missouri*, 63 UMKC L.Rev. 383, 284 (Spring 1995). The student comment is well written, but it is not law itself and cites no law to support the proposition that chapter 487 adopts a one family, one judge system. The comment cites a 1993 report by an American Bar Association Presidential Working Group and a 1993 newspaper article in which an advocate states her non-legal opinion that Missouri has adopted a "one family-one judge system." A student comment in a law review neither establishes the existence of the one family, one judge system advocated by the principal opinion, nor supports the conclusion that a petition to terminate parental rights is but a supplemental petition.

Countless psychological and child development studies have shown that children—especially infants and young children under the age of five—who are needlessly separated from their familiar parent suffer resulting deficits in their emotional and intellectual development. Joseph Goldstein, Albert J. Solnit, Sonja Goldstein and Anna Freud, *The Best Interests of the Child: The Least Detrimental Alternative*, 20 (1996). "When family integrity is broken or weakened by state intrusion, [the child's] needs are thwarted.... The effect on the child's developmental progress is likely to be detrimental." *Id.* at 90. When the issues involved so dramatically impact the lives of those involved, the courts should not curtail time-tested safeguards to fairness and legitimacy unless there is clear legal authority requiring them to do so.

I would follow the sound reasoning in *Brault* and hold once again that a petition to terminate parental rights is an independent civil action entitling parents in all cases to move for disqualification of the judge.