

# Missouri Court of Appeals

## Southern District

### Division Two

In the Interest of: )
A.A.R., and A.N.R., Minors, )
)
GREENE COUNTY JUVENILE )
OFFICE, )
)
    Petitioner-Respondent, )
)
vs. )   Nos. SD32873 and SD32874
)       (consolidated)
M.S.R., Mother, )
)   **Filed: Feb 21, 2014**
    Respondent-Appellant. )

## APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

### Honorable David Jones, Circuit Judge

**<u>AFFIRMED</u>**

      M.S.R. ("Mother") appeals the July 2013 judgments that terminated her parental

rights in, to, and over her children, A.A.R. (born in 2007) and A.N.R. (born in 2008) ("the

Children"). *See* section 211.447.[1] We address both appeals in this consolidated opinion

because the relevant facts and legal issues are nearly identical. Mother's single point

---

[1] The Children's father, whose parental rights were also terminated by the judgments, is not a party to this appeal. All statutory references are to RSMo Cum. Supp. 2012. The case was tried before a Family Court Commissioner. The Commissioner's recommended findings were then adopted by a circuit judge in the judgments. We refer collectively to these judicial officers as "the trial court."

contends "the evidence was insufficient to support a finding that a significant likelihood of future harm to the [Children] existed if parental rights were not terminated[.]"

Because the challenged finding was supported by substantial evidence, we affirm.

## Facts and Procedural Background

The following summary of the relevant evidence is presented in accordance with our standard of review, which requires us to view the "evidence and permissible inferences drawn from the evidence in the light most favorable to the judgment." *In re the Adoption of C.M.B.R.*, 332 S.W.3d 793, 801 (Mo. banc 2011). The two-day termination hearing was held in April 2013. The trial court took judicial notice of its files on "the underlying neglect cases[,]" a circuit court file concerning a yet-unresolved criminal charge against Mother for "endangering the welfare of a child[,]" and two court files regarding "termination actions . . . involving siblings of [the C]hildren."[2]

Betsy Burroughs worked as an investigator for the Children's Division of the Missouri Department of Social Services, ("Children's Division") in October 2010. She contacted Mother and the Children that month after receiving "hotline" reports alleging "unsanitary living conditions and other physical abuse[.]" In connection with her investigation of the hotline reports, Burroughs looked at Mother's previous history with Children's Division.

Burroughs found that there had been 16 previous hotline reports relating to Mother that dated back to 2004. A timeline developed from the past reports "demonstrated a pattern of [Mother's] frustration levels with her children."[3] The earliest reports concerned children

---

[2] None of these files were included in the record on appeal. As a result, we presume their contents would be favorable to the judgments. *In re T.R.W.*, 317 S.W.3d 167, 169 n.2 (Mo. App. S.D. 2010).

[3] Burroughs's "Investigative Court Summary" was received into evidence at the termination hearing upon "[n]o objection" by Mother's attorney. The report incorporated the timeline which detailed information about

2

"that [Mother] no longer had[.]" Five of the reports were made after the birth of A.A.R. Two of the reports, from 2007 and 2008, were determined by Children's Division to be substantiated by a preponderance of the evidence "against [Mother] for abrasions and lacerations" on a child. Burroughs was unsure of the identity of the child at issue.

Hotline reports directly concerning the Children began in 2009 with a report that Mother was witnessed yelling, "Mother Fucker dumb ass, you little fucker, look what you made me do with my drink[.]" It alleged that Mother then began throwing the older child to the ground before "throwing him into the stroller on top of the one year old." Mother later "admitted to yelling but denied any physical abuse."

While Mother was receiving in-home services in response to the 2009 incident, the caseworker reported that Mother had tied the bedroom door shut so her children could not get out. Mother "admitted to this and did not see a problem with it." After Burroughs learned "that [Mother] had locked her [other] children in their room while living [in South Carolina,]" she confronted Mother about a reported statement that "there was a report for tying her children's bedroom doors shut, but she truly did not know that was wrong." Mother "proceeded to inform [Burroughs] that she did not realize locking a child in their room with a rope was bad because in South Carolina she used a chain and they told her a chain was bad."

In April 2010, a report was received that Mother was observed "'yank[ing]' the three year old" by the arm, lifting his feet off the ground, and carrying him away by the arm. The reporting person also stated that Mother was "always calling [the Children] 'little assholes'

Mother's behavior involving two other children, including that the police were summoned to two retail stores in one day about Mother's actions toward these children, a report that Mother locked the children in their apartment while she was not there, and that the children's visits with Mother were terminated after they returned to their foster homes with bruises. Mother's parental rights over these two children were terminated in 2008.

and 'bastards[.]'" The investigative court summary noted that Mother "was resistant to making the changes that she agreed to[,]" but by the time the case was closed in May 2010, she had made some changes.

The first October 2010 report alleged that Mother had "grabbed the three year old by the neck and threw him to the ground." Burroughs testified that Mother was "seen . . . out near the street with her son" on that occasion, and Mother ultimately "attempted to somewhat throw him towards [sic] the street by his arm." The second October 2010 report alleged unsanitary living conditions and that Mother yelled at the Children, threatening to "beat [their] ass[es]."

Mother did not respond to Burroughs's first two efforts to contact her about the October 2010 reports, although Burroughs left her card at Mother's apartment. On Burroughs's third attempt, she was accompanied by "law enforcement," and she was successful in contacting Mother. At that time, Burroughs found that "overall . . . the apartment was sufficient." The Children were "not verbal enough" to be interviewed as one was "about two or three, and the other one [was] about a year younger[.]" Mother told Burroughs that she had "stop[ped] using any type of physical discipline due to the number of hotlines that she had received." Mother denied yanking her son's arm, but she admitted that "she still becomes frustrated with [the C]hildren and do[es] yell at them sometimes[.]" Mother "admitted that she needed counseling[ and] she still needs some help with her parenting skills, but that she did not respond well to the IIS [intensive in-home services] worker, because she was a female and . . . she didn't get along with female authority figures."

4

Burroughs referred "a Family Centered Service" ("FCS") worker to Mother, but that worker "reported that he was unable to make contact with [Mother] after several attempts." Burroughs indicated that the FCS worker provided "documentation" of his repeated efforts to contact Mother. During a "juvenile court conference" held in November 2013, Mother said that the FCS worker "had not tried to contact her." At the conference, Burroughs and the deputy juvenile officer "discussed each allegation with [Mother]," including the ones that had led to the termination of Mother's parental rights over her other children. Mother "denied every allegation, stating that people in the community just did not perceive her in the correct manner, and that's why she was having all of these hotlines." At the end of the November 2010 conference, the Children were taken into protective custody. According to Burroughs, that action was taken because "[t]he repeat maltreatments show that this was the beginning step in a pattern of the abuse that [Mother] had demonstrated in the past."

In January 2011, Robin Pummill began providing counseling services to Mother that continued to the date of trial, with the exception of a gap between November 2011 and April 2012. Pummill had "57 sessions with" Mother, "and lots of interventions . . . ha[d] been provided for [Mother.]" Despite those sessions and interventions, Pummill had concerns about Mother's lack of progress. Pummill said she was "looking at a parent that rather than take the responsibility for the actions, there was [a] great amount of avoidance and denial." She opined that "if that happens, then sometimes the person may not be as apt to make th[e] changes" needed to improve parenting. As of the time of trial, Pummill was still "concern[ed]" that Mother could parent the Children, and she did not believe that Mother was ready to parent the Children.

5

Larissa Francis was the assigned Children's Division caseworker for Mother and the Children from February 2011 until January 2012. She worked with Mother on a court-ordered "treatment plan" that began in December 2010. The goals of the plan were to assist Mother in learning "safe parenting through appropriate discipline and physical interaction"; being "able to meet the physical and developmental needs of the [C]hildren"; and "identify[ing and] understand[ing] day-to-day stressors." Mother was also provided "a parent aide" who supervised visits with the Children and helped Mother provide them with appropriate parenting. Mother completed anger management classes in March 2011. While Francis was assigned to the case, Mother progressed from initially having "supervised weekly visits" to eventually receiving "unsupervised weekend" visits. Mother provided in-kind support to the Children, but she did not provide them with any financial support even though she had obtained a job.

In December 2011, Francis recommended a "permissive placement" of the Children with Mother. That placement did not occur before the end of January because Mother had not followed through in securing the necessary daycare for the Children.

From January 2012 until September 2012, Jennifer Rogers was the assigned caseworker. She testified that the goal at the time was reunification of the family. She testified that Mother did not provide "[a]ctual [m]onetary" support for the Children, but she did provide them with gifts, and she financially supported them during the weeks that she had the Children permissively placed with her.

The permissive placement with Mother began on February 16, 2012. During that period of time, Rogers had some safety concerns for the Children as A.N.R. got a pair of scissors and cut curtains and a sheet with them. A.A.R. stepped on glass from a broken

candle and cut his foot. Mother indicated that she was not aware at the time of the incidents that the Children had climbed up to get the scissors or that the candle had been broken.

On March 5, 2012, Carla Renshaw was shopping at a Walmart when she heard "screaming that was going on across the store." Renshaw went toward the sound and "saw a lady being disruptive with her child[.]" Another child was also present, and the lady was cursing at the children. At trial, Renshaw identified Mother as the lady she had seen in the store. Renshaw saw Mother pick one child up out of the stroller by the arm "[a]nd drop[ ] her on the floor." The child being picked up by the arm could do nothing about what was happening. Renshaw said something to Mother, and Mother "told [her] to mind her own business, basically[.]" Renshaw told a store employee about the matter and then "called the police." Renshaw followed Mother out to a bus stop and stayed until "the police got there[.]"

Springfield Police Officer Daniel Rankey testified that he contacted Mother on March 5, 2012 at a bus-stop near a Walmart store in Springfield in response to "a call of concern[.]" Officer Rankey advised Mother that there had been a call regarding an incident occurring inside the store, and Mother denied that there had been "any type of physical abuse." Mother told Officer Rankey that "her daughter had a tantrum" and was "on the ground, kicking her legs and screaming[.]" The officer said that Mother exhibited an "odd" demeanor with "very rapid speech, [and] quick, jolting movements." Mother "appeared as though she wanted to cut the investigation short for some odd reason" and indicated that she "had to leave on the bus" when it arrived. Officer Rankey "felt it necessary to separate the [C]hildren from [Mother] at the time[,]" so he contacted "DFS" (a former acronym for Children's Division). When Rogers was called about the Walmart incident, she gave

7

permission for the Children to go back "with the previous foster family for the evening[.]" When a foster parent eventually came to Officer Rankey's location, the Children "ran to him and hugged him."

Rogers spoke with Mother the next day about the incident, and Mother "stated that she felt that the people at Walmart just misunderstood what was happening." At that point, Mother had already completed one "round" of parenting classes, so Rogers recommended additional parenting classes for Mother. Mother was seeing Pummill "[p]art of the time" while Rogers had the case; after the Walmart incident, Mother returned to counseling.

After the Children's permissive placement with Mother was revoked, the case goal changed from reunification to termination. The ongoing concerns about Mother were still anger management and lack of parenting skills; "the same issues that existed with regard to the other children that had been in care before [the Children.]" Rogers supervised "[a] lot" of visits between Mother and the Children on a weekly basis. She never had to stop a visit early, but she said "it was kind of close at times." Safety concerns arose when Rogers had to redirect Mother to address one of the Children "standing in the window, standing on an air conditioner vent, [or] standing in a high chair." Rogers prepared a "Termination Court Summary," and it was admitted into evidence as "Exhibit 5A" solely on the issue of whether termination would serve the best interest of the Children.

Lauren Mitchell, the parent aide assigned to Mother, first saw Mother in May 2012 "for parenting classes[.]" She "began supervising visits in August of 2012." Mitchell was "a proficiently licensed professional counselor" with a master's degree in counseling psychology. Mitchell continued to supervise visits up until the time of trial, except while she was on maternity leave during a portion of January and February, 2013.

8

The parenting classes Mother attended consisted of 30-32 hours over the course of about 15-16 weeks. Mother's homework for the course "was based on judgments [Mother] made of parents that she had seen in public. In other words, it was not personally reflective of her own behavior and how that affected [the C]hildren." Mother's reports of other visits she had with the Children before Mitchell began supervising them "conflicted with reports [Mitchell] was getting from team members[,]" and Mother never agreed that the other person's report was correct. For example, in June 2012, when Mitchell confronted Mother about a report which quoted Mother as yelling at the Children and cursing, Mother "denied ever yelling or cussing at her children."

Mother completed the parenting course. Mitchell's report noted that Mother "is able to verbally articulate what she's supposed to do in order to keep [the C]hildren safe and to be a nurturing parent." Mitchell also noted, however, that "[Mother]'s behaviors and attitudes during parenting classes and visits have not demonstrated an actual ability to provide a safe and nurturing atmosphere for [the C]hildren."

During one visit supervised by Mitchell, Mother promised that she would bring A.A.R. a cake and presents for his birthday at her next visit, which was scheduled for the day before his birthday. Mother did not bring anything to that visit, and she did not even acknowledge A.A.R.'s birthday until the end of the visit when A.A.R. said something about his birthday being the following day. Even then, Mother incorrectly insisted that his birthday was the day of her visit, not the following day. On a visit three weeks before trial, the following incident occurred:

> [A.A.R.] brought [a dime] with him to the visit. He'd been playing with it throughout the visit. When [Mother] noticed it, she grabbed it from his hand and said, "That's mine. I need it for the bus. That's part of my bus money."

9

When she checked her pockets and realized that it wasn't hers, she said, "Oh never mind," and just dropped it on the floor, and [A.A.R.] was crying.

Mitchell initially held Mother's supervised visits at her office. They were later held in the community until a visit at a library ended badly. During that December 2012 visit, Mother seemed to be reacting negatively toward A.A.R. When A.N.R. ran away from Mother's "line of sight," Mother "did not follow her . . . or attempt to manage that behavior." Mitchell retrieved A.N.R. from a bathroom and informed Mother that the visit was over. Mother "refused to leave the library."

Based on this and other incidents, Mitchell testified:

> [Mother]'s denial, blame shifting behaviors, justification for her behaviors or minimization of her behaviors have interfered with her ability to move forward in this case. From my perspective, this has been an ongoing problem. She had made some recent progresses, which is why we had moved the visits to the community. However, for the past couple of weeks she has again had some setbacks and sort of reverted back to some of those old habits.

Mitchell said that when "the [C]hildren's behavior escalates . . . [Mother]'s behavior escalates. She has difficulty staying calm and becomes easily overwhelmed. And this, in turn, escalates the [C]hildren further, and it's just a -- a vicious cycle." She also testified:

> [Mother] has gotten a little better about supervising [the Children]. However, historically she has made progress and then had setbacks. If we had had this court hearing last week, I might have said that she'd made significant progresses, but our visit last week was not a good visit and it just showed a lot of those same habits that, you know, she had fallen back into those same patterns. The visit started out rough because she arrived 30 minutes late, and it just went downhill from there.

Mitchell did "not feel confident that [Mother] could provide a safe and nurturing environment for the [C]hildren full time."

10

In September 2012, Patti Draper became the active caseworker and maintained that position at the time of trial. When she took over the case, "[t]here were still concerns with [Mother's] parenting skills and with her becoming frustrated with the [C]hildren." She testified that Mother told her that the Walmart incident "was all a misunderstanding and [the witness] just perceived her in the wrong way." In November 2012, Mother's visits with the Children were "moved . . . to the community[,]" but they were moved "back to the office in December" because Mother "was becoming increasingly frustrated with the [C]hildren. They were running all over. [Mother] wasn't able to corral them[.]" Two weeks before trial, the visits were moved "back to the community."

Draper testified that Mother's mother ("grandmother") had moved in with Mother. Mother said she had lost her job, and grandmother was helping with the rent. Draper was concerned about grandmother's presence in the home because she "was involved in North Carolina [sic] with [Mother]'s other two children that her rights have since been terminated on. [Grandmother] had knowledge of the [other] children being locked in their rooms with -- with the chains, and she did nothing to correct that." When Draper shared her concern with Mother, Mother "said it's all a misunderstanding[,]" and grandmother "just happened to be there[.]" Draper knew of no additional services that might allow Mother to provide the Children with appropriate care.

Mother did not testify or call any witnesses on her behalf. Findings made by the trial court in its termination judgments that are relevant to Mother's point on appeal will be set forth in our analysis of her claim.

**Applicable Principles of Review and Governing Law**

In terminating parental rights, "the trial court must find by clear, cogent, and convincing evidence that one or more grounds for termination

11

exist under subsections 2, 3, or 4 of section 211.447, and 2) the trial court must find that termination is in the best interests of the [child]." *In re P.L.O.*, 131 S.W.3d 782, 788 (Mo. banc 2004). "The clear, cogent, and convincing standard of proof is met when evidence 'instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.'" *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454 (Mo. banc 1984).

This Court reviews whether clear, cogent, and convincing evidence was presented to support a statutory ground for terminating parental rights under *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). *In re P.L.O.,* 131 S.W.3d at 788–789. Therefore, the trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy,* 536 S.W.2d at 32. The judgment will be reversed "only if we are left with a firm belief that the order is wrong." *In re S.M.H.,* 160 S.W.3d 355, 362 (Mo. banc 2005).

Conflicting evidence will be reviewed in the light most favorable to the trial court's judgment. *Id.* at 362. Appellate courts will defer to the trial court's credibility assessments. *In re Adoption of W.B.L.,* 681 S.W.2d at 455. When the evidence poses two reasonable but different inferences, this Court is obligated to defer to the trial court's assessment of the evidence. *Washington v. Barnes Hosp.,* 897 S.W.2d 611, 615 (Mo. banc 1995). "Greater deference is granted to a trial court's determinations in custody and adoption proceedings than in other cases." *In re S.L.N.,* 167 S.W.3d [736,] 741 [(Mo. App. W.D. 2005)].

*C.M.B.R.*, 332 S.W.3d at 815.

## Analysis

The trial court found two grounds for the termination of Mother's parental rights:  1) "[t]he [C]hild[ren were] abused and/or neglected by [Mother]";[4] and 2) "[t]he [C]hild[ren had] been subject to the Court's jurisdiction for more than one year and [Mother had] failed to rectify the conditions [that led] to the [C]hild[ren]'s placement in care.[5] *See* sections 211.447.5(2) and (3).  Mother correctly notes that a necessary proof requirement for each ground is that "the trial court must find that there is a likelihood of future harm to the child if

---

[4]"[A]buse (generally a direct action) and neglect (generally a failure to act) [are regarded as] different concepts[.]" *In re X.D.G.*, 340 S.W.3d 607, 617 n.6 (Mo. App. S.D. 2011).  As a result, the use of "abused and/or neglected" in a judgment should be avoided.
[5] Determination that one statutory ground exists is sufficient to uphold the judgment. *In re K.M.C., III*, 223 S.W.3d 916, 926 (Mo. App. S.D. 2007).

12

parental rights are not terminated[,]" citing *In re K.A.W.*, 133 S.W.3d 1, 9 (Mo. banc 2004), and it is the sufficiency of the evidence supporting that finding that Mother challenges on appeal. Specifically, she maintains that "there was insufficient evidence presented of a convincing link between prior behavior and predicted future behavior."[6]

In *K.A.W.*, our supreme court stated:

> An essential part of any determination whether to terminate parental rights is whether, considered at the time of the termination and looking to the future, the child would be harmed by a continued relationship with the parent. A prospective analysis is required to determine whether grounds exist and what is in the best interests of the child for the reasonably foreseeable future.

*Id.* The Court went on to state that "[p]ast behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior." *Id.* at 9-10. "[T]he trial court may not terminate a parent's rights on the basis of past conduct, unless that conduct is continuing and is likely to harm the child in the future." *In re T.A.L.*, 328 S.W.3d 238, 247 (Mo. App. W.D. 2010).

Here, the trial court specifically found:

> There is [a] significant likelihood of future harm to the [C]hild[ren] if parental rights are not terminated because . . . .[Mother] has been provided intensive services going back to 1994 [sic] when her other children were in care due to similar issues of physical and emotional abuse. [Mother] has continued to take [sic] responsibility for her behavior and has demonstrated an ongoing lack of insight into her parenting issues. The [C]hildren were permissively placed with [Mother] in 2012 and shortly thereafter she was observed physically and emotionally abusing one of the children in a public place, the same behavior she has demonstrated since at least 2004.

Mother correctly challenges the substantiality of the evidence supporting the trial court's finding of a significant likelihood of future harm by following the three-step process

---

[6] Mother's point does not contend that there was insufficient evidence for the trial court to find, as it did, that Mother had "abused and/or neglected" the Children in the past and failed to rectify the situation. Additionally, Mother's point does not challenge the findings that termination was in the best interest of the Children.

outlined in ***Houston v. Crider***, 317 S.W.3d 178, 187 (Mo. App. S.D. 2010). As the appellant, Mother must:

> (1)      identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
>
> (2)      identify all of the favorable evidence in the record supporting the existence of that proposition; and,
>
> (3)      demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.

***Id***.

Mother identifies the factual proposition at issue to be "that a significant likelihood of future harm exists." While we cannot state with confidence that Mother identified all of the evidence favorable to the proposition, she has identified at least some of the evidence favorable to it. She then argues that this favorable evidence lacked probative force because "[n]one of the professionals who testified at trial stated their belief that a likelihood of future harm existed if parental rights were not terminated." In making this argument, Mother contends that our "decision in [***X.D.G.***] indicates that it is not the trial court's duty to read into witness testimony the likelihood of future risk, it must be explicitly stated." We disagree.

In ***X.D.G.***, we considered whether the trial court could have found that "a clear, cogent, and 'convincing link' was established between [the m]other's past abuse of [the c]hild and the trial court's prediction of the likelihood of future abuse." 340 S.W.3d at 619. We presumed for the purpose of our analysis that the mother had "intentionally inflicted the bone fractures suffered by [the c]hild." ***Id***. In that case, we held that the trial court's finding of a likelihood of future harm was not supported by substantial evidence. ***Id***. at 610, 619,

14

and 622. We found that the testimony of a psychologist -- who did not recommend termination -- "was so speculative in regard to future risk that it could not combine with [the caseworker]'s testimony as previously related[7] (in itself insufficient to provide substantial evidence) so as to satisfy the legal standard of clear, cogent and convincing evidence." *Id.* at 619-20.[8]

We made a similar finding regarding the failure to rectify ground, stating that none of the trial court's additional findings "constitute[d] evidence of a convincing link between [the m]other's past behavior and a likelihood of future harm." *Id.* at 622. We also stated that "[n]o evidence was presented that a failure to explain or admit culpability for [the c]hild's injuries was the equivalent of evidence of future dangerousness. There was also a lack of any evidence demonstrating that [the m]other could not assimilate future services designed to keep [the c]hild from being harmed." *Id.*

Neither *K.A.W.* nor *X.D.G.* held that an expert witness must explicitly declare a likelihood of future harm. Nor do these cases require that any witness make such an affirmative declaration in order to support such a finding by the trial court. Instead, *K.A.W.* stated that "[t]here must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm." 133 S.W.3d at 10. In *X.D.G.*, we stressed that the opinion in that case was "limited to a finding that the record before us lacks sufficient evidence of the necessary 'convincing link' between [the m]other's past behavior and the likelihood of future harm." 340 S.W.3d at 622. In it, we discussed deficiencies in the

---

[7] The caseworker "indicated that he did not feel the parents would hurt [the c]hild while in their care, '[b]ut based on not knowing who hurt this child and a child abuse and neglect review that [he] got back in May 2009, [he] can't be 100 percent guaranteed that he would be safe in that home.'" *Id.* at 614.
[8] It is important to note that our use in *X.D.G.* of the "clear, cogent and convincing evidence" standard (the standard of proof relevant in the trial court) instead of the proper appellate review standard of "substantial evidence[,]" *id.* at 616, is in conflict with our supreme court's statement of the relevant standard of review in *C.M.B.R.* As a result, that specific portion of our opinion should no longer be followed or cited.

15

evidence presented, but the opinion in no way defined or limited the form of evidence that might sufficiently support a trial court's finding that such a convincing link was proven.

Mother argues that "there is reason to question whether the trial court effectively considered the testimony of [Pummill,]" citing the trial court's finding that Mother "attended therapy with [Pummill] from January 2011 through April of 2012 when [Mother] stopped attending." Mother argues that the finding is factually incorrect.

The court's findings regarding Pummill's testimony were made in connection with the failure to rectify ground. Pummill and Rogers testified that there was a gap in Mother's counseling sessions with Pummill. But this discrepancy in the trial court's findings is not significant as Pummill had provided approximately 57 counseling sessions and was providing counseling services to Mother at the time of trial. The important testimony from Pummill was her opinion about the effectiveness of counseling. The trial court could reasonably conclude from her testimony that despite many sessions and "lots of interventions[,]" Pummill was still concerned at the time of trial about Mother's progress and believed that Mother was not ready to parent the Children. Further, Pummill's testimony supported an inference that Mother would avoid responsibility and deny her actions regarding the Children and that such behavior indicated that she is the type of person who is less apt to make the changes necessary to improve his or her parenting.

Further, the trial court did not rest its finding of a future likelihood of harm solely upon the testimony of Pummill -- it found that Mother "demonstrated an ongoing lack of insight into her parenting issues" and cited Mother's history while receiving "intensive services[.]" The trial court also linked Mother's recent behavior during the Walmart incident

-- where "she was observed physically and emotionally abusing one of the [C]hildren in a public place" -- with "the same behavior she has demonstrated since at least 2004."

As argued by Respondent, we agree that the evidence of Mother's behavior before the assumption of jurisdiction, her behavior that lead to the assumption of jurisdiction, her behavior after the trial court took jurisdiction, and the opinions of service providers who testified at trial all constituted substantial evidence supporting the trial court's finding "that there was a significant likelihood of future harm to the [C]hildren if [Mother's] parental rights were not terminated."

Burroughs, the initial investigator, testified that she saw a pattern in Mother's behavior and that Mother would not follow through with services provided to her as a result of incidents involving her children. This pattern of not following through with services continued while Francis was the caseworker as Mother did not timely obtain daycare services for the Children so that they could be permissively placed with her. Such a placement was approved in December, but Mother was not ready for the Children to be placed with her until February 16, 2012. Even after the permissive placement was made, Rogers continued to be concerned about the safety of the Children because one was able to get a hold of scissors, and the other cut his foot on glass from a broken candle, all while they were in Mother's care and without her knowledge.

Despite a "round" of parenting classes, the permissive placement only lasted until March 5, 2012, when Renshaw heard screaming in the Walmart store and saw Mother pulling one of the Children from a stroller by one arm and dropping the child on the floor. The trial court was entitled to credit that testimony, and Mother's explanation that other

17

people "just misunderstood what was happening" supported a reasonable inference that Mother lacked insight into the abusive nature of her conduct.

Mitchell, who conducted parenting classes with Mother following the Walmart incident and also supervised some visits, testified that Mother still had "not demonstrated an actual ability to provide a safe and nurturing atmosphere for [the C]hildren." She believed that Mother's ongoing problems with blame shifting and minimization "interfered with her ability to move forward in th[e] case." Mitchell said that Mother became overwhelmed easily and that her behaviors escalated as the Children's escalated such that it created a "vicious cycle." At the time of trial, Mitchell still did "not feel confident that [Mother] could provide a safe and nurturing environment for the [C]hildren full time."

Draper, Mother's caseworker at the time of trial, testified that Mother still insisted that the Walmart incident "was all a misunderstanding and [the witness] just perceived her in the wrong way." Draper was concerned about grandmother living with Mother when grandmother did nothing to intervene when Mother had previously chained the door to her children's room. She was also concerned with Mother's insistence that grandmother's role in that incident had also been misunderstood. This behavior was consistent with other evidence that demonstrated Mother was not assimilating the benefits of an anger management class, repeated instruction in parenting, and psychological counseling. Finally, Draper testified that there were no other services which had not been offered to Mother that might be able to turn her situation around.

In *K.A.W.*, the Court observed that "it is difficult to predict the future[,]" but it also noted that in addition to "the parent's past conduct," section 211.447 permits the consideration of "the parent's conduct following the trial court's assumption of jurisdiction

18

as good evidence of future behavior." 133 S.W.3d at 9. Here, substantial evidence supported the trial court's finding that Mother's behavior following the assumption of jurisdiction demonstrated that she could not appropriately parent the Children and that this was "good evidence of future behavior." *Id.*

Unlike *X.D.G.*, where there was no evidence demonstrating a convincing link between past behavior and a future likelihood of harm, 340 S.W.3d at 622, the trial court here had evidence of Mother's repeated behaviors, lack of insight, and a failure to assimilate services -- all of which was substantial evidence bearing upon the likelihood of future danger.

Mother's point is denied, and the judgments are affirmed.


DON E. BURRELL, J. - OPINION AUTHOR

JEFFREY W. BATES, P.J. - CONCURS

GARY W. LYNCH, J. - CONCURS

19